# EXHIBIT 1

CITATION: Elsley v. Bordynuik, 2013 ONSC 1210
COURT FILE NO.: 6312/12
DATE: 2013-03-01

## SUPERIOR COURT OF JUSTICE - ONTARIO

RE:        Sandra Elsley, Plaintiff

           AND:

           John Bordynuik, Defendant

BEFORE:    The Honourable Mr. Justice Robert Nightingale

COUNSEL:   Frederick Hawa       Counsel, for the Plaintiff

           Mark Abradjian       Counsel, for the Defendant

HEARD:     February 12, 2013

### ENDORSEMENT

[1] The Defendant brings this motion to set aside the order of Justice Matheson obtained without notice on December 20, 2012 granting a Mareva Injunction in favour of the Plaintiff effectively preventing the Defendant from disposing of any of his assets until further order of the court. The essential grounds are that there was non-disclosure of material facts to Justice Matheson at the time of the original motion and that the Plaintiff does not have a prima facie case.

[2] The Plaintiff seeks to uphold the order of Justice Matheson as confirmed temporarily by Justice Turnbull on January 2, 2013. She submits that even if that original order should be set aside on any of the grounds submitted by the Defendant, she is still entitled to a Mareva Injunction against the Defendant now based on all of the facts and evidence obtained since the date of the original order.

[3] For reasons that follow, I am granting the Defendant's motion to set aside the Order of Justice Matheson of December 20, 2012 and dismissing the Plaintiff's motion to continue the Mareva Injunction to trial.

THE FACTS

[4] The essential facts provided to Justice Matheson by the Plaintiff in her affidavit on December 20, 2012 were that the Plaintiff met the Defendant in 2002 and that they subsequently cohabited from 2006 to 2008 terminating their relationship in October 2008.

[5] The Plaintiff stated that during her relationship, she closed her 18-year-old Counselling practice to work for the Defendant and provided a complete commitment to the Defendant's private Ontario company which was involved in the technology field of reading and preserving archived legacy data. She indicated she invested significant time and money in his company and that she owned 13.1% of its shares.

[6] She indicated that the Defendant arranged for this Ontario company to be acquired by a Delaware company in order to raise significant funds from investors and the Plaintiff maintained her 13.1% shareholdings in the Delaware company. She swore that her shareholdings of that Delaware company were approximately 7,750,000 common shares or 13.1% of the total shares.

[7] She also indicated that this Delaware company in July 2008 had over $2,500,000 of cash in it but that the Defendant had depleted that cash within six months by over $1 million.

[8] The Plaintiff then deposed that the Defendant in order to raise more capital purchased the stock of a publicly traded Nevada company at which time that Nevada company purchased the Delaware company by transferring approximately 800,000 of its shares to the Delaware company. She suggested in her material that the asset sale to the Nevada company was not for fair value.

[9] She stated that she was had been assured by the Defendant that she would remain a similar 13.1% shareholder of the Nevada company as she had been for the Ontario and Delaware companies.

[10] She then deposed in the affidavit that she received 303,000 shares of the Nevada company by April 23, 2009 and that she didn't learn until much until later on when she consulted with her lawyers that the Nevada company in fact had issued over 40 million shares to the Defendant. She suggested accordingly that she ought to have received 5,272,750 shares of the Nevada company which would make up the 13.1% share in her favour.

[11] She accordingly swore that her claim against the Defendant was on the basis that the Defendant should be found to hold over 5 million shares that he owned in trust for her to make up the difference of the 13.1% shareholding.

[12] In paragraph 65 of her affidavit that was provided to Justice Matheson she stated the following:

> Under a lot of pressure from Bordynuik and at the time he was transferring JBI Nevada shares to the shareholders of JB I -Nevada, I have now been advised that Bordynuik fabricated and misrepresented a series of justifications for providing me with only 303,000 shares of JB I- Nevada. Among those fabrications were that:
>
> a. Because of trading restrictions under the SEC's rules I could only be provided with and trade 300,000 shares per quarter, I am advised that this is not true and nevertheless I did not receive 300,000 shares per quarter in any event;
>
> b. Bordynuik also advised that 303,000 free trading shares were a fair exchange instead of 5,272,750 restricted shares I would have received. That too I am advised was a deceptive lie. In fact had I received the entire 5,272,000, the holding period would have expired and during the last three years I am advised that I could have sold my shares into the market.

[13] The Plaintiff went on to depose in her affidavit that the Defendant over a period of three years from 2009 returned almost 31,000,000 common shares he owned in the Nevada company to its treasury, that she believed that part of the reason he had done so was to avoid payment to his creditors and that if he continued to return his shares to the Nevada company's treasury she would never recover on any claim against him.

[14] She also stated that he was effectively transferring his assets out of the country to the United States by reason of his returning his Nevada company shares to treasury and that because of his history of personal bankruptcy and questionable dealings with the assets of the Ontario and Delaware companies, she verily believed that he would make it impossible for her to realize on any judgment obtained against him.

[15] She also repeated that she had intimate knowledge of his finances because of his bankruptcy issues and that she verily believed that he would alienate or hide all of his assets in order to avoid any payment to her.

[16] The Plaintiff's motion record materials provided to Justice Matheson consisted of two thick volumes including the 76 paragraph affidavit and attached voluminous exhibits.

[17] With respect to those documents, the Plaintiff did include a copy of her Statement of Claim, the Defendant's Statement of Defence as delivered by his lawyer in July 2012 and the Plaintiff's Reply delivered in August 2012. Again, the Plaintiff's motion proceeded without notice to the Defendant or his Counsel on December 20, 2012, the time of year of the usual Christmas rush and the pending holidays which the Plaintiff and her Counsel would realize would indeed make it difficult for the Defendant to move to set aside the order in a quick fashion.

[18] Justice Matheson granted the Plaintiff's requested order after Plaintiff's Counsel attended on the motion on an ex parte basis.

[19] The Defendant upon being served with the court order and supporting Plaintiff's material immediately brought this motion to set aside the order on January 2, 2013. There was not sufficient time to hear the motion that day and the matter was adjourned to February 12 for a hearing on that motion.

## NON-DISCLOSURE OF SETTLEMENT AND LOAN AGREEMENT

[20] The Defendant's position is that the order should not have been granted in the first place on the basis that there was no urgency for the matter to proceed without notice. More importantly, he states that the Plaintiff clearly did not provide the full and frank disclosure

required of her and in fact withheld very significant and relevant evidence from Justice Matheson which dealt with the very merits of the Plaintiff's case and her obligation to establish a prima facie case when asking for a Mareva Injunction.

[21]    What the Plaintiff did not disclose in her affidavit as confirmed in the Defendant's affidavit is that the Defendant just prior to the commencement of this action had sued the Plaintiff for defamation and for an injunction because of defamatory remarks being made by the Plaintiff on the Internet concerning the Defendant and his actions regarding the companies. After the Defendant's lawyers served the Plaintiff's lawyer (the lawyers were the same lawyers as are involved in this action) with the injunction motion, the defamation action was immediately settled on consent.

[22]    However, what was not disclosed to Justice Matheson is that the Plaintiff's employment with the Defendant was terminated allegedly with cause in October 2008 and that the Plaintiff then owed the Defendant approximately $129,000 in outstanding loans at the time of her termination for which demand for payment was being made in March 2009 by the Defendant.

[23]    Most significantly, the Defendant in his affidavit in that action confirmed that there was in fact a settlement reached in June 2009 between him and the Plaintiff whereby the Plaintiff was to receive 300,000 shares in the Nevada company which was a full and final settlement of any claim she had as an employee or shareholder of the Ontario company and any potential claim she may fabricate as against the Defendant personally. He also stated that at the time of the settlement and generally throughout his relationship with her, the Plaintiff had a lawyer or accountant and other professionals advising her.

[24]    That signed two-page settlement document, being exhibit M of his affidavit purports to be signed by the Plaintiff on June 25, 2009. That document makes it very clear that the Plaintiff had an option to make one of two choices when dealing with the shares of the Nevada company. The first was for her to take ownership of 7,775,000 shares of non-eligible restricted stock of the Nevada company apparently with certain sale restrictions which could affect their value. It was clear in the document itself that the Defendant recommended that

the Plaintiff exercise her option to obtain these shares as had her independent financial advisor, a Mr. Larry Maxwell.

[25]     The settlement agreement's other option was for the Plaintiff to own 300,000 free trading shares of the Nevada company through a purchase of stock from a third-party which stock would have no restrictions and could freely be sold.

[26]     What is most significant is that the Plaintiff in her affidavit before Justice Matheson on December 20, 2012 said nothing about this settlement agreement which appears clearly to be the reason why she received the 300,000 non-restricted shares in the Nevada company and which the court was advised she sold shortly after that receiving anywhere between $.50 to $2.00 per share.

[27]     Moreover, even though the Defendant referred to that settlement agreement specifically in paragraph 37, 38 and 40 of his Statement of Defence, which Statement of Defence consisted of 47 paragraphs, the Plaintiff did not refer Justice Matheson at all to that particular position of the Defendant in her affidavit material or by her Counsel commenting on it while appearing before him.

[28]     What is crucial in this case is that it is the Defendant's position that the settlement agreement is binding on the Plaintiff and that is the end of the Plaintiff's case as it effectively confirms she has no entitlement to the 7,750,000 restricted shares of the Nevada company from the Defendant or otherwise. Most significantly, Plaintiff's Counsel in argument conceded that if the settlement agreement is valid and binding, the Plaintiff's action against the Defendant cannot succeed.

[29]     When confronted with the Defendant's affidavit, the Plaintiff then filed a subsequent affidavit of January 2, 2003 wherein she suggested she didn't recall the contents of the settlement agreement at the time she "purportedly signed them" and did not have copies. She also stated that she didn't understand the choices in the settlement agreement and was allegedly coerced into signing it under a "tremendous amount of duress. "

[30]     She then swore a further affidavit of January 22, 2013 stating she signed the settlement agreement under pressure but didn't recall signing it and also stating that she would be

seeking a forensic handwriting expert to verify her signature. She denied receiving the settlement agreement in draft form from the Defendant prior to June 25, 2009 although it appears from the Defendant's affidavit that he had provided a document to her by email correspondence on June 17,2009 before she signed it.

[31] After the cross examinations of the Plaintiff on her affidavits had been conducted wherein she admitted that she had in fact discussed some of the terms of the settlement agreement with her financial advisor, the Plaintiff served a further affidavit on the date of the hearing of this motion attaching email correspondence between herself and the Defendant dated June 25, 2009, the same day that the settlement agreement was signed. That email correspondence of June 25 makes it clear that the Defendant provided to the Plaintiff a draft of that settlement document stating that he had included a document "for the stock option you chose" and asking her to please execute the agreements and decide which way she wanted to go.

[32] Email correspondence was then returned by the Plaintiff to the Defendant which stated that "this crazy drafted agreement is nuts" but that she was taking the 300,000 shares as was originally proposed which was obviously one of the two options referred to in that agreement.

[33] What is also most significant is that even though she swore in her affidavit of January 22, 2013 that she was currently seeking forensic handwriting expertise in order to verify her signature on that document, it appears that affidavit was false as her Counsel conceded that neither she nor he had even consulted a forensic handwriting expert as of the date of the hearing of this motion on February 12.

[34] In addition, Plaintiff's Counsel on the hearing of this motion stated that he now realized that the Plaintiff may have to pursue the Nevada company directly to have 7,750,000 restricted shares of it issued to the Plaintiff as the transfer of those shares to her may not have been the obligation of the Defendant personally from his own shareholdings. He advised the court that he was already trying to obtain the consent of Defendant's lawyer to an order adding the Nevada company as a Defendant in this action.

[35]    However, at no time to date has there been any attempt by the Plaintiff to amend her Statement of Claim or Reply to suggest that the written settlement agreement of June 25, 2009 is of no effect or is null and void and not binding on her or that it isn't her signature attached to it.

[36]    The failure of the Plaintiff in her original affidavit or her Counsel to advise Justice Matheson at the hearing of and make a very specific reference to this settlement agreement which would be dispositive of the Plaintiff's action is troubling, to say the least, given the very heavy onus on the Plaintiff to initially provide full and frank disclosure of all relevant facts to Justice Matheson in the case. This includes not only those facts supporting her position but also the facts regarding the position of the Defendant. The existence of that settlement agreement also has a very significant bearing regarding the heavy onus of the Plaintiff in a Mareva Injunction motion to establish that she has a prima facie case on the merits while this document clearly suggests that she may not.

[37]    When asked for an explanation as to why the settlement document or its existence was not provided to Justice Matheson in the Plaintiff's affidavit, I received an answer from Plaintiff's Counsel that suggested that neither he nor his client was likely aware of it at the time. However, Mr. Abradjian acting for the Defendant pointed out that that settlement agreement was referred to in his client's motion record that was served on the same Plaintiff's lawyer in the prior defamation action injunction motion on July 25, 2012 and which in fact was attached as an exhibit to his client's affidavit.

[38]    It therefore appears clear that the Plaintiff had that document in the possession of her Counsel when the Reply document in this action was delivered by him on August 14, 2012. Plaintiff's Counsel suggested to the Court that he may not have read it or passed it on to his client before receiving her instructions to settle the defamation lawsuit injunction motion. There was no affidavit evidence filed to support that position and I made it clear to Plaintiff's Counsel during submissions that I found that position rather strange and of considerable concern given his obligations as a lawyer to his client in that action and especially given his client's and his obligation to provide full and frank disclosure to Justice Matheson in this motion.

ADDTIONAL NON- DISCLOSURE BEFORE JUSTICE MATHESON

[39] There were additional incidents of nondisclosure in a material way before Justice Matheson as indicated by the Defendants.

[40] The Plaintiff stated in her affidavit that it was because of the Defendant's history of personal bankruptcy that she thought it would be impossible for her to realize on a judgment against him and that he might alienate or hide his assets to avoid payment for her.

[41] In fact, as noted by the Defendant, he had never been personally bankrupt but rather he did have a history of a company in which he had an interest declaring bankruptcy.

[42] Plaintiff's Counsel had prepared her affidavit and attached a bankruptcy notice dated August 10, 2012 filed by AI Applications Inc. and not by the Defendant personally which the Plaintiff in her affidavit suggested nevertheless related to the Plaintiff's personal bankruptcy. The obvious purpose was to suggest that this was material evidence for Justice Matheson to consider in deciding whether to grant the Mareva Injunction.

[43] Plaintiff's Counsel indicated to the Court that he had not noticed that the document pertained to the Defendant's company rather than him personally and also suggested in his submissions that his client may have had a different interpretation of the word "bankruptcy" even though he was the one who prepared her affidavit using that word. She however had stated when cross-examined on her affidavit that she knew as far back as August 2012 that the Defendant had not been personally bankrupt yet that is not what Justice Matheson was told on December 20, 2012.

[44] There was also further evidence in her affidavit that was obviously meant to suggest to Justice Matheson that the Defendant was impecunious and hence making it important for Justice Matheson to consider granting an order to prevent the Defendant from disposing of his assets pending a trial.

[45] For example, she stated very clearly that throughout their period of time together ,she supported him as he had no money and that he was living in a motel at the time of her

swearing her affidavit i.e. suggesting that he had no permanent residence and implying he could leave the country at any time.

[46]  However, when she was cross-examined, she admitted that the evidence in the Defendant's affidavit was true that the Defendant in fact owned the hotel in which he was residing and that she had known that from her real estate friend since the summer of 2012 as well as knowing that he was in the process of renovating it. Not disclosing that to Justice Matheson instead of what she actually stated in her affidavit was misleading at best and untrue at worst.

[47]  In addition, Plaintiff's Counsel conceded in his submissions that there was really no evidence in the Plaintiff's affidavit material to suggest that the Plaintiff had taken any steps whatsoever since the date of the settlement agreement in June 2009 until the commencement of this action in June 2012 to claim that she was entitled to the 7,750,000 restricted shares of the Nevada company either in addition to or in place of the 300,000 non-restricted shares she actually received in June 2009.

[48]  The lack of any evidence of such steps to advance that position for three years could lead to the logical inference that the Plaintiff in fact had reached a settlement of all issues regarding the Nevada company shares in June 2009 and knew she did not have and could not pursue a claim for the additional shares.

[49]  That certainly was not made clear in her affidavit of December 18, 2012 that was provided to Justice Matheson who was obviously not aware of the settlement agreement and would not likely have appreciated on reading the affidavit as a whole that the Plaintiff had done nothing for three years to try and take the position that she now was.

[50]  This obviously relates to as well the issue of the lack of urgency with respect to the motion for summary judgment and whether there is any merit to the Plaintiff's claim based on a prima facie case especially as it suggests that the Plaintiff was aware of and accepted the terms of the June 2009 settlement agreement in which the Defendant had actually recommended that she take the 7,750,000 restricted shares of the Nevada company rather than the 300,000 unrestricted shares.

THE LAW

[51] As the Plaintiff proceeded with her motion without notice to the Defendant, Rule 39.01(6) was applicable:

> (6) Where a motion or application is made without notice, the moving party or applicant shall make full and fair disclosure of all material facts, and failure to do so is in itself sufficient ground for setting any order obtained on the motion or application.

[52] The leading decision on the grounds for obtaining or setting aside an order for a Mareva Injunction is that of the Court of Appeal of *Chitel v. Rothbart* (1982) 39 O.R.(3d) 513. The main principles that a court must consider on such motions are as follows:

> a) The Plaintiff must make full and frank disclosure of all matters in his knowledge which are material for the judge to know.
>
> b) The Plaintiff should give particulars of his claim against the Defendant stating the grounds of his claim and the amount thereof and fairly stating the points against it by the Defendant such that the Plaintiff has a prima facie case.
>
> c) The Plaintiff should give some grounds for believing that the Defendant has assets here.
>
> d) The Plaintiff should give some grounds for believing that there is risk of the assets being removed before the judgment or award is satisfied.
>
> e) The Plaintiffs must give an undertaking in damages.

[53] Of all the principles referred to above, it is the failure of the Plaintiff to provide full and frank disclosure of all the material facts to Justice Matheson on December 20, 2012 that results in the Defendant being entitled to his requested relief that the Mareva Injunction order be rescinded immediately.

[54]     The complete failure to advise Justice Matheson in the Plaintiff's affidavit or in submissions by her Counsel before him of the written settlement agreement of June 2009 which both parties agreed would dispose of the Plaintiff's case if it were held to be binding and valid is, in my view, exactly the type of nondisclosure that was contemplated by the Court of Appeal in *Chitel*, supra, that would result in an immediate rescission of the Mareva Injunction granted at first instance. This is especially so given the nature of the order obtained which in effect tied up all assets of the Defendant and not just his shares in the Nevada company without notice to him.

[55]     Moreover, the tactics utilized by Plaintiff's Counsel in this case of proceeding with her motion without notice to Defendant's Counsel when he himself had been provided with notice of an injunction motion in a defamation action not long before are indeed questionable to say the least especially given the three year period of inaction of the Plaintiff and the time of year of the motion knowing the problems the Defendant would have obtaining the appropriate court time and date to try and set any order granted aside.

[56]     Plaintiff's Counsel in submissions suggested that by his including the Statement Defence in his affidavit material that would have been be sufficient disclosure before Justice Matheson regarding the issue of the settlement agreement. However, common sense, his obligations as an officer of the court and the law all confirm that he must do more than that. The Plaintiff must ensure that the presiding justice is referred to specifically the part of the document or documents that outline the nature of the Defendant's position so that the court knows exactly the positions of both parties. *Komarnycky v  Laramee* (2012) O.J. No. 5439; *Euro United Corp. v. Rehani* (2003) O. J. No. 2426. That clearly was not done in this case and in fact this position advanced by Plaintiff's Counsel appears to be somewhat inconsistent with his other position that he wasn't aware nor was his client of the June 2009 written settlement agreement at the time of the motion before Justice Matheson.

[57]     In addition, as indicated above, there are other examples of nondisclosure and in fact provision of information that was clearly wrong that was included in the affidavit material before Justice Matheson which on a cumulative basis, would likely have been material and most relevant in his coming to his decision on whether he should grant the original Order.

[58] In my view, the test is not whether Justice Matheson's decision would have been the same had this information been provided to him. The correct approach is to ascertain whether the judge hearing the ex parte motion was entitled to be made aware of the withheld information so that he or she would have a complete picture before making a decision. Information is material if it is relevant to the position the other party would put forward if present . It is not necessary that it would have dictated a different result; Gray, J. in *Fox v. Fox* (2012) O.J. No. 2959 @ p. 32 .

[59] Accordingly, the Defendant's motion is granted and the order of Justice Matheson of December 20, 2012 is hereby set aside.

PLAINTIFF'S MOTION TO CONTINUE THE INJUNCTION

[60] The Plaintiff's position is that even if the order of Justice Matheson is set aside because of nondisclosure, she should still be entitled to a "new" Mareva Injunction at this point because of evidence that has been obtained with respect to the Defendant's "dissipation" of a substantial amount of his shares in the Nevada company because of his having them returned to the treasury since the commencement of this action.

[61] I do not agree with that position and I decline to exercise my discretion in favour of continuing the Mareva Injunction and order that the Plaintiff's motion be dismissed for the following reasons.

[62] The Plaintiff has not met in my view the heavy onus of establishing she has a prima facie case. The signed June 2009 settlement agreement, if found to be valid and binding, completely disposes of the Plaintiff's action regardless of what the Defendant has done with his shares.

[63] At present, there is nothing in the Plaintiff's pleadings to suggest that the settlement agreement is not binding by reason of misrepresentation, duress, non est factum or other related defences or that the Plaintiff did not sign the agreement.

[64] There is no question that the Plaintiff received 300,000 unrestricted shares and shortly thereafter sold them rather than take the 7,750,000 restricted shares of the Nevada company

which in the longer term may have turned out to be more financially rewarding. There is no evidence that she then did anything for three years after she sold the 300,000 unrestricted shares to claim that she was now also entitled to the 7,750,000 unrestricted shares which appears to be more consistent with the suggestion she had settled all her claims in June 2009 than not.

[65]    Moreover, the Plaintiff has already apparently taken the steps to add the Nevada company as a Defendant suggesting it had the responsibility to issue the Plaintiff her shares rather than the Defendant personally. However, that proposed motion does not include the potential amendment to the pleadings to suggest the settlement agreement is not binding. By suggesting it is a Nevada company that is responsible to the Plaintiff regarding the issuance of the shares in fact, in my view, takes away from rather than adds to the Plaintiff's position that it has a prima facie case against the Defendant personally.

[66]    Secondly, I am not satisfied on the evidence before me that the Plaintiff has established that the Defendant has been dissipating his assets by simply returning his shares to the treasury of the Nevada company. Based on the documents that he provided, he has been doing so with full regulatory authority and on notice to the public as required by the US Securities Exchange Commission. In addition, the Plaintiff has adduced no evidence to suggest that if she is successful in her action against the Defendant personally or when added, the Nevada company, her judgment cannot be enforced either here in Ontario or the State of Nevada to collect it. There has to be a genuine risk of disappearance of assets before the injunction should issue and with essentially no evidence of dissipation of assets for the purpose of defeating a possible judgment in favour of the Plaintiff, I am not satisfied that the Plaintiff has met the required onus of proof on her in that regard. *Aetna Financial Services Ltd. v. Feigelman* (1985) 1 S. C. R. 2; *Sharpe J. A., Injunctions and Specific Performance*, paragraph 2.880.

[67]    Lastly, there was significant evidence provided regarding whether or not an undertaking from the Plaintiff to be responsible for the Defendant's damages if a Mareva Injunction were granted would be of any value or significance to the Defendant. She initially provided an undertaking to be responsible for the damages "if she was unsuccessful" at the trial but that

undertaking was changed to an unconditional undertaking as a term of the adjournment of this motion before Justice Turnbull on January 2, 2013.

[68] Her affidavit of January 2, 2013 however stated that her financial situation in June 2009 was desperate, that she was in fact impecunious and without funds, that she was about to lose her home, that her Counselling practice was suffering and that she had a large debt load.

[69] Although, she initially denied it on her cross examination, she eventually admitted that one of the witnesses whose affidavit she provided on this motion was in fact a client from whom she had borrowed money and was still indebted to her which suggests that she no longer had significant funds at the time of the motion.

[70] Although Plaintiff's Counsel indicated that she had in fact sold her 300,000 shares at between $.50 to $2.00 per share and was prepared to provide an up to date financial statement, I had no evidence before me as to what her actual financial position was at this time and whether, practically speaking, her undertaking would be of any value. If the Plaintiff's financial position is less than adequate to ensure the Defendant's damages could be paid, the court can exercise its discretion by refusing to continue until trial an ex parte injunction restraining the Defendant from interfering with the Plaintiff and the operation of its business. *90207 Canada Ltd. v. MapleLeaf Village Limited* [1981] O.J. No.2200, 24 C.P.C. 152 (Catzman ,J). In this case, the lack of any evidence establishing the ability of the Plaintiff to now honour a significant award of costs against her after a trial , given the history of this matter, also confirms that I should not exercise my discretion to continue the Mareva Injunction to trial.

[71] For all of these reasons, the Plaintiff's motion for an interim Mareva Injunction is dismissed.

[72] I am prepared to consider written submissions from the Defendant regarding his costs of this motion to be provided within 10 days from the date of this order including no more than five pages of submissions plus his bill of costs and dockets and details of any offers to settle. The Plaintiff will have five days after that to provide her submissions restricted to five pages and, if appropriate, her bill of costs and offers to settle.

The Honourable Mr. Justice R. Nightingale

Date: March 1, 2013