**EXHIBIT 1**

EX-3.2 3 f10sb12gex3ii_expedite2.htm BY-LAWS

**BY-LAWS**

**ARTICLE I**

**The Corporation**

**Section 1    Name.** The legal name of this corporation (hereinafter called the "Corporation") is Expedite 2 Inc.

**Section 2    Offices.** The Corporation shall have its principal office in the State of Delaware. The Corporation may also have offices at such other places within and without the United States as the Board of Directors may from time to time appoint or the business of the Corporation may require.

**Section 3    Seal.** The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware". One or more duplicate dies for impressing such seal may be kept and used.

**ARTICLE II**

**Meetings of Shareholders**

**Section 1    Place of Meetings.** All meetings of the shareholders shall be held at the principal office of the Corporation in the State of New Delaware or at such other place, within or without the State of Delaware, as is fixed in the notice of the meeting.

**Section 2    Annual Meeting.** An annual meeting of the shareholders of the Corporation for the election of directors and the transaction of such other business as may properly come before the meeting shall be held on the 1st day of February in each year if not a legal holiday, and if a legal holiday, then on the next secular day. If for any reason any annual meeting shall not be held at the time herein specified, the same may be held at any time thereafter upon notice, as herein provided, or the business thereof may be transacted at any special meeting called for the purpose.

**Section 3    Special Meetings.** Special meetings of shareholders may be called by the President whenever he deems it necessary or advisable. A special meeting of the shareholders shall be called by the President whenever so directed in writing by a majority of the entire Board of Directors or whenever the holders of one third (1/3) of the number of shares of the capital stock of the Corporation entitled to vote at such meeting shall, in writing, request the same.

**Section 4    Notice of Meetings.** Notice of the time and place of the annual and of each special meeting of the shareholders shall be given to each of the shareholders entitled to vote at such meeting by mailing the same in a postage prepaid wrapper addressed to each such shareholders at his address as it appears on the books of the Corporation, or by delivering the same personally to any such shareholder in lieu of such mailing, at least ten (10) and not more than fifty (50) days prior to each meeting. Meetings may be held without notice if all of the shareholders entitled to vote thereat are present in person or by proxy, or if notice thereof is waived by all such shareholders not present in person or by proxy, before or after the meeting. Notice by mail shall be deemed to be given when deposited, with postage thereon prepaid, in the United States mail. If a meeting is adjourned to another time, not more than thirty (30) days hence, or to another place, and if an announcement of the adjourned time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting unless the Board of Directors, after adjournment fix a new record date for the adjourned meeting. Notice of the annual and each special meeting of the shareholders shall indicate that it is being issued by or at the direction of the person or persons calling the meeting, and shall state the name and capacity of each such person. Notice of each special meeting shall also state the purpose or purposes for which it has been called. Neither the business to be transacted at nor the purpose of the annual or any special meeting of the shareholders need be specified in any written waiver of notice.

1

**Section 5    Record Date for Shareholders.** For the purpose of determining the shareholders entitled to notice of or to vote at any meeting of shareholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or for the purpose of determining shareholders entitled to receive payment of any dividend or other distribution or the allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than fifty (50) days nor less than ten (10) days before the date of such meeting, nor more than fifty (50) days prior to any other action. If no record date is fixed, the record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the day next preceding the day on which notice is given, or, if no notice is given, the day on which the meeting is held; the record date for determining shareholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is expressed; and the record date for determining shareholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. A determination of shareholders of record entitled to notice of or to vote at any meeting of shareholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

**Section 6    Proxy Representation.** Every shareholder may authorize another person or persons to act for him by proxy in all matters in which a shareholder is entitled to participate, whether by waiving notice of any meeting, voting or participating at a meeting, or expressing consent or dissent without a meeting. Every proxy must be signed by the shareholder or by his attorney-in-fact. No proxy shall be voted or acted upon after eleven (11) months from its date unless such proxy provides for a longer period. Every proxy shall be revocable at the pleasure of the shareholder executing it, except as otherwise provided in Section 608 of the Delaware Business Corporation Law.

**Section 7    Voting at Shareholders' Meetings.** Each share of stock shall entitle the holder thereof to one vote. In the election of directors, a plurality of the votes cast shall elect. Any other action shall be authorized by a majority of the votes cast except where the Delaware Business Corporation Law prescribes a different percentage of votes or a different exercise of voting power. In the election of directors, and for any other action, voting need not be by ballot.

**Section 8    Quorum and Adjournment.** Except for a special election of directors pursuant to the Delaware Business Corporation Law, the presence, in person or by proxy, of the holders of a majority of the shares of the stock of the Corporation outstanding and entitled to vote thereat shall be requisite and shall constitute a quorum at any meeting of the shareholders. When a quorum is once present to organize a meeting, it shall not be broken by the subsequent withdrawal of any shareholders. If at any meeting of the shareholders there shall be less than a quorum so present, the shareholders present in person or by proxy and entitled to vote thereat, may adjourn the meeting from time to time until a quorum shall be present, but no business shall be transacted at any such adjourned meeting except such as might have been lawfully transacted had the meeting not adjourned.

**Section 9    List of Shareholders.** The officer who has charge of the stock ledger of the Corporation shall prepare, make and certify, at least ten (10) days before every meeting of shareholders, a complete list of the shareholders, as of the record date fixed for such meeting, arranged in alphabetical order, and showing the address of each shareholder and the number of shares registered in the name of each shareholder. Such list shall be open to the examination of any shareholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city or other municipality or community where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any shareholder who is present. If the right to vote at any meeting is challenged, the inspectors of election, if any, or the person presiding thereat, shall require such list of shareholders to be produced as evidence of the right of the persons challenged to vote at such meeting, and all persons who appear from such list to be shareholders entitled to vote thereat may vote at such meeting.

**Section 10    Inspectors of Election.** The Board of Directors, in advance of any meeting, may, but need not, appoint one or more inspectors of election to act at the meeting or any adjournment thereof. If an inspector or inspectors are not appointed, the person presiding at the meeting may, and at the request of any shareholder entitled to vote thereat shall, appoint one or more inspectors.

2

In case any person who may be appointed as an inspector fails to appear or act, the vacancy may be filled by appointment made by the Board of Directors in advance of the meeting or at the meeting by the person presiding thereat. Each inspector, if any, before entering upon the discharge of his duties, shall take and sign an oath faithfully to execute the duties of the inspector at such meeting with strict impartiality and according to the best of his ability. The inspectors, if any, shall determine the number of shares of stock outstanding and the voting power of each, the shares of stock represented at the meeting, the existence of a quorum, the validity and effect of proxies, and shall receive votes, ballots or consents, hear and determine all challenges and questions arising in connection with the right to vote, count and tabulate all votes, ballots or consents, determine the result, and do such acts as are proper to conduct the election or vote with fairness to all shareholders. On request of the person presiding at the meeting or any shareholder entitled to vote thereat, the inspector or inspectors, if any, shall make a report in writing of any challenge, question or matter determined by him or them and execute a certificate of any fact found by him or them. Any report or certificate made by the inspector or inspectors shall be prima facie evidence of the facts stated and of the vote as certified by them.

     **Section 11     Action of the Shareholders without Meetings.** Any action which may be taken at any annual or special meeting of the shareholders may be taken without a meeting on written consent, setting forth the action so taken, signed by the holders of all outstanding shares entitled to vote thereon. Written consent thus given by the holders of all outstanding shares entitled to vote shall have the same effect as a unanimous vote of the shareholders.

**ARTICLE III**

**Directors**

     **Section 1     Number of Directors.** The number of directors which shall constitute the entire Board of Directors shall be at least one (1). Subject to the foregoing limitation, such number may be fixed from time to time by action of a majority of the entire Board of Directors or of the shareholders at an annual or special meeting, or, if the number of directors is not so fixed, the number shall be one (1). No decrease in the number of directors shall shorten the term of any incumbent director.

     **Section 2     Election and Term.** The initial Board of Directors shall be elected by the incorporator and each initial director so elected shall hold office until the first annual meeting of shareholders and until his successor has been elected and qualified. Thereafter, each director who is elected at an annual meeting of shareholders, and each director who is elected in the interim to fill a vacancy or a newly created directorship, shall hold office until the next annual meeting of shareholders and until his successor has been elected and qualified.

     **Section 3     Filling Vacancies, Resignation and Removal.** Any director may tender his resignation at any time. Any director or the entire Board of Directors may be removed, with or without cause, by vote of the shareholders. In the interim between annual meetings of shareholders or special meetings of shareholders called for the election of directors or for the removal of one or more directors and for the filling of any vacancy in that connection, newly created directorships and any vacancies in the Board of Directors, including unfilled vacancies resulting from the resignation or removal of directors for cause or without cause, may be filled by the vote of a majority of the remaining directors then in office, although less than a quorum, or by the sole remaining director.

     **Section 4     Qualifications and Powers.** Each director shall be at least eighteen (18) years of age. A director need not be a shareholder, a citizen of the United States or a resident of the State of Delaware. The business of the Corporation shall be managed by the Board of Directors, subject to the provisions of the Certificate of Incorporation. In addition to the powers and authorities by these By-Laws expressly conferred upon it, the Board may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws directed or required to be exercised or done exclusively by the shareholders.

3

**Section 5    Regular and Special Meetings of the Board.** The Board of Directors may hold its meetings, whether regular or special, either within or without the State of Delaware. The newly elected Board may meet at such place and time as shall be fixed by the vote of the shareholders at the annual meeting, for the purpose of organization or otherwise, and no notice of such meeting shall be necessary to the newly elected directors in order legally to constitute the meeting, provided a majority of the entire Board shall be present; or they may meet at such place and time as shall be fixed by the consent in writing of all directors. Regular meetings of the Board may be held with or without notice at such time and place as shall from time to time be determined by resolution of the Board. Whenever the time or place of regular meetings of the Board shall have been determined by resolution of the Board, no regular meetings shall be held pursuant to any resolution of the Board altering or modifying its previous resolution relating to the time or place of the holding of regular meetings, without first giving at least three (3) days written notice to each director, either personally or by telegram, or at least five (5) days written notice to each director by mail, of the substance and effect of such new resolution relating to the time and place at which regular meetings of the Board may thereafter be held without notice. Special meetings of the Board shall be held whenever called by the President, Vice-President, the Secretary or any director in writing. Notice of each special meeting of the Board shall be delivered personally to each director or sent by telegraph to his residence or usual place of business at least three (3) days before the meeting, or mailed to him to his residence or usual place of business at least five (5) days before the meeting. Meetings of the Board, whether regular or special, may be held at any time and place, and for any purpose, without notice, when all the directors are present or when all directors not present shall, in writing, waive notice of and consent to the holding of such meeting, which waiver and consent may be given after the holding of such meeting. All or any of the directors may waive notice of any meeting and the presence of a director at any meeting of the Board shall be deemed a waiver of notice thereof by him. A notice, or waiver of notice, need not specify the purpose or purposes of any regular or special meeting of the Board.

**Section 6    Quorum and Action.** A majority of the entire Board of Directors shall constitute a quorum except that when the entire Board consists of one director, then one director shall constitute a quorum, and except that when a vacancy or vacancies prevents such majority, a majority of the directors in office shall constitute a quorum, provided that such majority shall constitute at least one-third (1/3) of the entire Board. A majority of the directors present, whether or not they constitute a quorum, may adjourn a meeting to another time and place. Except as herein otherwise provided, and except as otherwise provided by the Delaware Business Corporation Law, the vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board.

**Section 7    Telephonic Meetings.** Any member or members of the Board of Directors, or of any committee designated by the Board, may participate in a meeting of the Board, or any such committee, as the case may be, by means of conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time, and participation in a meeting by such means shall constitute presence in person at such meeting.

**Section 8    Action Without a Meeting.** Any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

**Section 9    Compensation of Directors.** By resolution of the Board of Directors, the directors may be paid their expenses, if any, for attendance at each regular or special meeting of the Board or of any committee designated by the Board and may be paid a fixed sum for attendance at such meeting, or a stated salary as director, or both. Nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor; provided, however, that directors who are also salaried officers shall not receive fees or salaries as directors.

**ARTICLE IV**

**Committees**

**Section 1    In General.** The Board of Directors may, by resolution or resolutions passed by the affirmative vote therefore of a majority of the entire Board, designate an Executive Committee and such other committees as the Board may from time to time determine, each to consist of one (1) or more directors, and each of which, to the extent provided in the resolution or in the Certificate of Incorporation or in the By-Laws, shall have all the powers of the Board, except that no such Committee shall have power to fill vacancies in the Board, or to change the membership of or to fill vacancies in any

committee, or to make, amend, repeal or adopt By-Laws of the Corporation, or to submit to the shareholders any action that needs shareholder approval under these By-Laws or the Delaware Business Corporation Law, or to fix the compensation of the directors for serving on the Board or any committee thereof, or to amend or repeal any resolution of the Board which by its terms shall not be so amendable or repealable. Each committee shall serve at the pleasure of the Board. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

4

**Section 2     Executive Committee.** Except as otherwise limited by the Board of Directors or by these By-Laws, the Executive Committee, if so designated by the Board of Directors, shall have and may exercise, when the Board is not in session, all the powers of the Board of Directors in the management of the business and affairs of the Corporation, and shall have power to authorize the seal of the Corporation to be affixed to all papers which may require it. The Board shall have the power at any time to change the membership of the Executive Committee, to fill vacancies in it, or to dissolve it. The Executive Committee may make rules for the conduct of its business and may appoint such assistance as it shall from time to time deem necessary. A majority of the members of the Executive Committee, if more than a single member, shall constitute a quorum.

## ARTICLE V

### Officers

**Section 1     Designation, Term and Vacancies.** The officers of the Corporation shall be a President, one or more Vice-Presidents, a Secretary, a Treasurer, and such other officers as the Board of Directors may from time to time deem necessary. Such officers may have and perform the powers and duties usually pertaining to their respective offices, the powers and duties respectively prescribed by law and by these By-Laws, and such additional powers and duties as may from time to time be prescribed by the Board. The same person may hold any two or more offices, except that the offices of President and Secretary may not be held by the same person unless all the issued and outstanding stock of the Corporation is owned by one person, in which instance such person may hold all or any combination of offices.

The initial officers of the Corporation shall be appointed by the initial Board of Directors, each to hold office until the meeting of the Board of Directors following the first annual meeting of shareholders and until his successor has been appointed and qualified. Thereafter, the officers of the Corporation shall be appointed by the Board as soon as practicable after the election of the Board at the annual meeting of shareholders, and each officer so appointed shall hold office until the first meeting of the Board of Directors following the next annual meeting of shareholders and until his successor has been appointed and qualified. Any officer may be removed at any time, with or without cause, by the affirmative note therefor of a majority of the entire Board of Directors. All other agents and employees of the Corporation shall hold office during the pleasure of the Board of Directors. Vacancies occurring among the officers of the Corporation shall be filled by the Board of Directors. The salaries of all officers of the Corporation shall be fixed by the Board of Directors.

**Section 2     President.** The President shall preside at all meetings of the shareholders and at all meetings of the Board of Directors at which he may be present. Subject to the direction of the Board of Directors, he shall be the chief executive officer of the Corporation, and shall have general charge of the entire business of the Corporation. He may sign certificates of stock and sign and seal bonds, debentures, contracts or other obligations authorized by the Board, and may, without previous authority of the Board, make such contracts as the ordinary conduct of the Corporation's business requires. He shall have the usual powers and duties vested in the President of a corporation. He shall have power to select and appoint all necessary officers and employees of the Corporation, except those selected by the Board of Directors, and to remove all such officers and employees except those selected by the Board of Directors, and make new appointments to fill vacancies. He may delegate any of his powers to a Vice-President of the Corporation.

**Section 3     Vice-President.** A Vice-President shall have such of the President's powers and duties as the President may from time to time delegate to him, and shall have such other powers and perform such other duties as may be assigned to him by the Board of Directors. During the absence or incapacity of the President, the Vice-President, or, if there be more than one, the Vice-President having the greatest seniority in office, shall perform the duties of the President, and when so acting shall have all the powers and be subject to all the responsibilities of the office of President.

**Section 4    Treasurer.** The Treasurer shall have custody of such funds and securities of the Corporation as may come to his hands or be committed to his care by the Board of Directors. Whenever necessary or proper, he shall endorse on behalf of the Corporation, for collection, checks, notes, or other obligations, and shall deposit the same to the credit of the Corporation in such bank or banks or depositaries, approved by the Board of Directors as the Board of Directors or President may designate. He may sign receipts or vouchers for payments made to the Corporation, and the Board of Directors may require that such receipts or vouchers shall also be signed by some other officer to be designated by them. Whenever required by the Board of Directors, he shall render a statement of his cash accounts and such other statements respecting the affairs of the Corporation as may be required. He shall keep proper and accurate books of account. He shall perform all acts incident to the office of Treasurer, subject to the control of the Board.

**Section 5    Secretary.** The Secretary shall have custody of the seal of the Corporation and when required by the Board of Directors, or when any instrument shall have been signed by the President duly authorized to sign the same, or when necessary to attest any proceedings of the shareholders or directors, shall affix it to any instrument requiring the same and shall attest the same with his signature, provided that the seal may be affixed by the President or Vice-President or other officer of the Corporation to any document executed by either of them respectively on behalf of the Corporation which does not require the attestation of the Secretary. He shall attend to the giving and serving of notices of meetings. He shall have charge of such books and papers as properly belong to his office or as may be committed to his care by the Board of Directors. He shall perform such other duties as appertain to his office or as may be required by the Board of Directors.

**Section 6    Delegation.** In case of the absence of any officer of the Corporation, or for any other reason that the Board of Directors may deem sufficient, the Board may temporarily delegate the powers or duties, or any of them, of such officer to any other officer or to any director.

**ARTICLE VI**

**Stock**

**Section 1    Certificates Representing Shares.** All certificates representing shares of the capital stock of the Corporation shall be in such form not inconsistent with the Certificate of Incorporation, these By-Laws or the laws of the State of Delaware of the Business Corporation Law. Such shares shall be approved by the Board of Directors, and shall be signed by the President or a Vice-President and by the Secretary or the Treasurer and shall bear the seal of the Corporation and shall not be valid unless so signed and sealed. Certificates countersigned by a duly appointed transfer agent and/or registered by a duly appointed registrar shall be deemed to be so signed and sealed whether the signatures be manual or facsimile signatures and whether the seal be a facsimile seal or any other form of seal. All certificates shall be consecutively numbered and the name of the person owning the shares represented thereby, his residence, with the number of such shares and the date of issue, shall be entered on the Corporation's books. All certificates surrendered shall be cancelled and no new certificates issued until the former certificates for the same number of shares shall have been surrendered and cancelled, except as provided for herein. In case any officer or officers who shall have signed or whose facsimile signature or signatures shall have been affixed to any such certificate or certificates, shall cease to be such officer or officers of the Corporation before such certificate or certificates shall have been delivered by the Corporation, such certificate or certificates may nevertheless be adopted by the Corporation, and may be issued and delivered as though the person or persons who signed such certificates, or whose facsimile signature or signatures shall have been affixed thereto, had not ceased to be such officer or officers of the Corporation.

Any restriction on the transfer or registration of transfer of any shares of stock of any class or series shall be noted conspicuously on the certificate representing such shares.

6

**Section 2    Fractional Share Interests.** The Corporation, may, but shall not be required to, issue certificates for fractions of a share. If the Corporation does not issue fractions of a share, it shall: (1) arrange for the disposition of fractional interests by those entitled thereto; (2) pay in cash the fair value of fractions of a share as of the time when those entitled to receive such fractions are determined; or (3) issue scrip or warrants in registered or bearer form which shall entitle the holder to receive a certificate for a full share upon the surrender of such scrip or warrants aggregating a full share. A certificate for a fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to receive voting rights, to receive dividends thereon, and to participate in any distribution of the assets of the Corporation in the event of liquidation. The Board of Directors may cause scrip or warrants to be issued subject to the conditions that they shall become void if not exchanged for certificates representing full shares before a specified date, or subject to the condition that the shares for which scrip or warrants are exchangeable may be sold by the Corporation and the proceeds thereof distributed to the holders of scrip or warrants, or subject to any other conditions which the Board of Directors may impose.

**Section 3    Addresses of Shareholders.** Every shareholder shall furnish the Corporation with an address to which notices of meetings and other notices may be served upon or mailed to him, and in default thereof notices may be addressed to him at his last known post office address.

**Section 4    Stolen, Lost or Destroyed Certificates.** The Board of Directors may in its sole discretion direct that a new certificate or certificates of stock be issued in place of any certificate or certificates of stock theretofore issued by the Corporation, alleged to have been stolen, lost or destroyed, and the Board of Directors when authorizing the issuance of such new certificate or certificates, may, in its discretion, and as a condition precedent thereto, require the owner of such stolen, lost or destroyed certificate or certificates or his legal representatives to give to the Corporation and to such registrar or registrars and/or transfer agent or transfer agents as may be authorized or required to countersign such new certificate or certificates, a bond in such sum as the Corporation may direct not exceeding double the value of the stock represented by the certificate alleged to have been stolen, lost or destroyed, as indemnity against any claim that may be made against them or any of them for or in respect of the shares of stock represented by the certificate alleged to have been stolen, lost or destroyed.

**Section 5    Transfers of Shares.** Upon compliance with all provisions restricting the transferability of shares, if any, transfers of stock shall be made only upon the books of the Corporation by the holder in person or by his attorney thereunto authorized by power of attorney duly filed with the Secretary of the Corporation or with a transfer agent or registrar, if any, upon the surrender and cancellation of the certificate or certificates for such shares properly endorsed and the payment of all taxes due thereon. The Board of Directors may appoint one or more suitable banks and/or trust companies as transfer agents and/or registrars of transfers, for facilitating transfers of any class or series of stock of the Corporation by the holders thereof under such regulations as the Board of Directors may from time to time prescribe. Upon such appointment being made all certificates of stock of such class or series thereafter issued shall be countersigned by one of such transfer agents and/or one of such registrars of transfers, and shall not be valid unless so countersigned.

### ARTICLE VII

#### Dividends and Finance

**Section 1    Dividends.** The Board of Directors shall have power to fix and determine and to vary, from time to time, the amount of the working capital of the Corporation before declaring any dividends among its shareholders, and to direct and determine the use and disposition of any net profits or surplus, and to determine the date or dates for the declaration and payment of dividends and to determine the amount of any dividend, and the amount of any reserves necessary in their judgment before declaring any dividends among its shareholder, and to determine the amount of the net profits of the Corporation from time to time available for dividends.

**Section 2    Fiscal Year.** The fiscal year of the Corporation shall end on the last day of December in each year and shall begin on the next succeeding day, or shall be for such other period as the Board of Directors may from time to time designate with the consent of the Department of Taxation and Finance, where applicable.

### ARTICLE VIII

7

## Miscellaneous Provisions

**Section 1      Stock of Other Corporations.** The Board of Directors shall have the right to authorize any director, officer or other person on behalf of the Corporation to attend, act and vote at meetings of the shareholders of any corporation in which the Corporation shall hold stock, and to exercise thereat any and all rights and powers incident to the ownership of such stock, and to execute waivers of notice of such meetings and calls therefor; and authority may be given to exercise the same either on one or more designated occasions, or generally on all occasions until revoked by the Board. In the event that the Board shall fail to give such authority, such authority may be exercised by the President in person or by proxy appointed by him on behalf of the Corporation. Any stocks or securities owned by this Corporation may, if so determined by the Board of Directors, be registered either in the name of this Corporation or in the name of any nominee or nominees appointed for that purpose by the Board of Directors.

**Section 2      Books and Records.** Subject to the Delaware Business Corporation Law, the Corporation may keep its books and accounts outside the State of Delaware.

**Section 3      Notices.** Whenever any notice is required by these By-Laws to be given, personal notice is not meant unless expressly so stated, and any notice so required shall be deemed to be sufficient if given by depositing the same in a post office box in a sealed postpaid wrapper, addressed to the person entitled thereto at his last known post office address, and such notice shall be deemed to have been given on the day of such mailing. Whenever any notice whatsoever is required to be given under the provisions of any law, or under the provisions of the Certificate of Incorporation or these By-Laws a waiver in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

**Section 4      Amendments.** Except as otherwise provided herein, these By-Laws may be altered, amended or repealed and By-Laws may be made at any annual meeting of the shareholders or at any special meeting thereof if notice of the proposed alteration, amendment or repeal, or By-Law or By-Laws to be made be contained in the notice of such special meeting, by the holders of a majority of the shares of stock of the Corporation outstanding and entitled to vote thereat; or by a majority of the Board of Directors at any regular meeting of the Board of Directors, or at any special meeting of the Board of Directors, if notice of the proposed alteration, amendment or repeal, or By-Law or By-Laws to be made, be contained in the notice of such special meeting.

8

**EXHIBIT 2**

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

## Share Transaction Journal

| Date | Disposed: Name of Shareholder | No. of Shares | Acquired: Name of Shareholder | No. of Shares | How? | Balance Now |
|---|---|---|---|---|---|---|
| 27-Sep-07 | | | Sheila Hunter | 100,000 | NEW | 100,000 |
| | | | | | TRANS | 0 |
| 18-Jul-08 | Sheila Hunter | 100,000 | John Bordynuik | 100,000 | TRANS | 100,000 |
| 2-Feb-09 | | | 1264282 Ontario Ltd. (Jade Amusem | 8,000 | JBMERGE | 8,000 |
| | | | 1515437 Ontario Inc. | 200,000 | JBMERGE | 200,000 |
| | | | Albano, Bruno | 2,000 | JBMERGE | 2,000 |
| | | | Anthes (In-trust Emily C. Anthes), Tho | 16,000 | JBMERGE | 16,000 |
| | | | Anthes, Colin B. | 20,000 | JBMERGE | 20,000 |
| | | | Anthes, Fiona | 16,000 | JBMERGE | 16,000 |
| | | | Anthes, Thomas Victor | 350,000 | JBMERGE | 350,000 |
| | | | Bagley, Brenda | 50,000 | JBMERGE | 50,000 |
| | | | Barnett, Alan | 402,600 | JBMERGE | 402,600 |
| | | | Barnett, Holly | 24,000 | JBMERGE | 24,000 |
| | | | Barnett, Tom | 6,000 | JBMERGE | 6,000 |
| | | | Beam, Janet | 4,000 | JBMERGE | 4,000 |
| | | | Beni, Mildred | 3,000 | JBMERGE | 3,000 |
| | | | Best Real Estate Buy Inc. | 30,000 | JBMERGE | 30,000 |
| | | | Biamonte, Joseph | 10,000 | JBMERGE | 10,000 |
| | | | Biamonte, Napoleon | 122,000 | JBMERGE | 122,000 |
| | | | Biamonte, Ralph | 5,000 | JBMERGE | 5,000 |
| | | | Biamonte, Sarah | 2,000 | JBMERGE | 2,000 |
| | | | Bjorgan, Chris | 2,000 | JBMERGE | 2,000 |
| | | | Bordynuik Sr., John | 2,000,000 | JBMERGE | 2,000,000 |
| | | | Bordynuik, Janet | 2,000 | JBMERGE | 2,000 |
| | | | Bordynuik, John | 36,208,345 | JBMERGE | 36,308,345 |
| | | | Boric, Dean | 44,000 | JBMERGE | 44,000 |
| | | | Boric, Doug | 8,000 | JBMERGE | 8,000 |
| | | | Boric, Douglas | 8,000 | JBMERGE | 8,000 |
| | | | Bosche, Donalda | 30,000 | JBMERGE | 30,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Disposed | | Acquired | | | |
|---|---|---|---|---|---|---|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | Balance Now |
| | | | Bosco, Kelly | 10,000 | JBMERGE | 10,000 |
| | | | Bosco, Larry | 10,000 | JBMERGE | 10,000 |
| | | | Bourbonnais, Mike | 20,000 | JBMERGE | 20,000 |
| | | | Brain, Kevin | 116,000 | JBMERGE | 116,000 |
| | | | Brewster, Donna | 3,000 | JBMERGE | 3,000 |
| | | | Brock, Erwin | 2,000 | JBMERGE | 2,000 |
| | | | Brown, Christopher | 4,000 | JBMERGE | 4,000 |
| | | | Brown, Ian | 200,000 | JBMERGE | 200,000 |
| | | | Brown, Tina | 200,000 | JBMERGE | 200,000 |
| | | | Byford, Dennis | 6,000 | JBMERGE | 6,000 |
| | | | Candler, Curt | 20,000 | JBMERGE | 20,000 |
| | | | Caputo, Marie | 55,000 | JBMERGE | 55,000 |
| | | | Cavanagh, Christine | 2,000 | JBMERGE | 2,000 |
| | | | Chevalier, Wayne Thomas | 20,000 | JBMERGE | 20,000 |
| | | | Clarke, Steve | 2,000 | JBMERGE | 2,000 |
| | | | Cooper, Richard | 1,000 | JBMERGE | 1,000 |
| | | | Corp. 168309 tst | 1,500,000 | JBMERGE | 1,500,000 |
| | | | Craig, Kathryn | 15,000 | JBMERGE | 15,000 |
| | | | Crown, Heather | 1,000 | JBMERGE | 1,000 |
| | | | Cucuz (In Trust-Juliana Cucuz), Nada | 2,000 | JBMERGE | 2,000 |
| | | | Cucuz, Dragoljub | 1,000 | JBMERGE | 1,000 |
| | | | Cucuz, Nada | 1,000 | JBMERGE | 1,000 |
| | | | Culliford, Keith | 1,400 | JBMERGE | 1,400 |
| | | | Cummings, Stephen | 20,000 | JBMERGE | 20,000 |
| | | | Cushing, Catherine | 20,000 | JBMERGE | 20,000 |
| | | | Cushing, Robert | 20,000 | JBMERGE | 20,000 |
| | | | D'Amico, Michael | 10,000 | JBMERGE | 10,000 |
| | | | Deurloo, Beverley Joan | 120,000 | JBMERGE | 120,000 |
| | | | Dickson, Lorraine | 10,000 | JBMERGE | 10,000 |
| | | | Dixon, Betty | 2,000 | JBMERGE | 2,000 |
| | | | Doede, Steve | 1,400,000 | JBMERGE | 1,400,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Disposed | | Acquired | | | |
|---|---|---|---|---|---|
| Date | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | Balance Now |
| | | | D'Orazio( In-trust Samara & Lucas Jef | 10,000 | JBMERGE | 10,000 |
| | | | D'Orazio, Marina | 46,875 | JBMERGE | 46,875 |
| | | | Dorey, Jeffrey | 8,000 | JBMERGE | 8,000 |
| | | | Drapeau, Lynn | 10,000 | JBMERGE | 10,000 |
| | | | Dutton, Evan | 80,000 | JBMERGE | 80,000 |
| | | | Eisley (In-trust Kristin Eisley), Sandra | 3,000 | JBMERGE | 3,000 |
| | | | Eisley, Sandra | 7,750,000 | JBMERGE | 7,750,000 |
| | | | Esposito, Christina | 1,000 | JBMERGE | 1,000 |
| | | | Evans, Catherine | 1,000 | JBMERGE | 1,000 |
| | | | Evans, David | 35,000 | JBMERGE | 35,000 |
| | | | Evans, Gordon | 4,000 | JBMERGE | 4,000 |
| | | | Evans, Michael | 1,000 | JBMERGE | 1,000 |
| | | | Evans, Robin | 120,000 | JBMERGE | 120,000 |
| | | | Evans,Wendy | 150,000 | JBMERGE | 150,000 |
| | | | Everson, Connie | 8,000 | JBMERGE | 8,000 |
| | | | Falconer, Frank | 20,000 | JBMERGE | 20,000 |
| | | | Farrington, Pamela L. | 2,000 | JBMERGE | 2,000 |
| | | | Ferrante, Theresa C. | 12,000 | JBMERGE | 12,000 |
| | | | Finch, Raymond | 3,000 | JBMERGE | 3,000 |
| | | | Finch, Ruth | 3,000 | JBMERGE | 3,000 |
| | | | Forsyth, Jeffrey | 50,000 | JBMERGE | 50,000 |
| | | | Forsyth, Victoria | 50,000 | JBMERGE | 50,000 |
| | | | Gallo, Roy | 40,000 | JBMERGE | 40,000 |
| | | | Gatto, Nikkie | 1,000 | JBMERGE | 1,000 |
| | | | Gerhardt, Kent | 5,000 | JBMERGE | 5,000 |
| | | | Gisel, Tara | 2,000 | JBMERGE | 2,000 |
| | | | Goodyear, Charles | 114,000 | JBMERGE | 114,000 |
| | | | Goodyear, Hope | 2,000 | JBMERGE | 2,000 |
| | | | Gordon, Rachael | 4,000 | JBMERGE | 4,000 |
| | | | Gorman, Sheri | 4,250 | JBMERGE | 4,250 |
| | | | Green, Michael | 170,000 | JBMERGE | 170,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

Share Transaction Journal

27 Sept 2007 through 27 July 2009

| Disposed | | Acquired | | | |
|---|---|---|---|---|---|
| Date | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | Balance Now |
| | | | Harris, Barbara | 8,000 | JBMERGE | 8,000 |
| | | | Harry Fois Poultry Farms | 40,000 | JBMERGE | 40,000 |
| | | | Haskell, David | 1,000 | JBMERGE | 1,000 |
| | | | Haskell, Nancy | 3,000 | JBMERGE | 3,000 |
| | | | Hrin, Peter | 50,000 | JBMERGE | 50,000 |
| | | | Hunter, Gillies | 300,000 | JBMERGE | 300,000 |
| | | | Hunter, Karen | 4,000 | JBMERGE | 4,000 |
| | | | IP Trust | 1,500,000 | JBMERGE | 1,500,000 |
| | | | Jewell, Pat | 2,000 | JBMERGE | 2,000 |
| | | | Johnson, Scott | 66,000 | JBMERGE | 66,000 |
| | | | Jordan, Earl T. | 20,000 | JBMERGE | 20,000 |
| | | | Jovanovic, Mirko | 20,000 | JBMERGE | 20,000 |
| | | | Kafal, Adam | 2,750 | JBMERGE | 2,750 |
| | | | Kafal, Paul | 45,250 | JBMERGE | 45,250 |
| | | | Kafal, Peter | 100,000 | JBMERGE | 100,000 |
| | | | Kajganich (In-Trust Bradley Kajganich | 1,000 | JBMERGE | 1,000 |
| | | | Kajganich, Anne | 2,000 | JBMERGE | 2,000 |
| | | | Kajganich, Joanne | 1,000 | JBMERGE | 1,000 |
| | | | Kajganich, Michael | 1,000 | JBMERGE | 1,000 |
| | | | Kajganich, Nicholas | 1,000 | JBMERGE | 1,000 |
| | | | Kandasamy, Fay | 120,000 | JBMERGE | 120,000 |
| | | | Kandasamy, Gerald | 80,000 | JBMERGE | 80,000 |
| | | | Kandasamy, Keith | 17,000 | JBMERGE | 17,000 |
| | | | Kelly (In Trust-Scarlett Kelly), Mary | 5,000 | JBMERGE | 5,000 |
| | | | Kelly, Mary | 7,000 | JBMERGE | 7,000 |
| | | | Kelly, Patrick | 7,000 | JBMERGE | 7,000 |
| | | | Kelly, Patrick Thomas | 1,000 | JBMERGE | 1,000 |
| | | | Kent, R. Gordon | 40,000 | JBMERGE | 40,000 |
| | | | Kobryn, David | 20,000 | JBMERGE | 20,000 |
| | | | Kobryn, Scott | 30,000 | JBMERGE | 30,000 |
| | | | Krkljus, Mile | 10,000 | JBMERGE | 10,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| | Disposed | | Acquired | | | |
|---|---|---|---|---|---|---|
| Date | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | Balance Now |
| | | | Kvas, Anton | 10,000 | JBMERGE | 10,000 |
| | | | Lahaie, Mike | 2,000 | JBMERGE | 2,000 |
| | | | Lane, Jennifer | 250 | JBMERGE | 250 |
| | | | Lane, Jeremy | 100,000 | JBMERGE | 100,000 |
| | | | Latinovic, Boro | 2,000 | JBMERGE | 2,000 |
| | | | Lazaroski, Dejan | 6,000 | JBMERGE | 6,000 |
| | | | Litalien, Connie | 35,000 | JBMERGE | 35,000 |
| | | | Litalien, Trisha | 10,000 | JBMERGE | 10,000 |
| | | | Macesic, Branko | 24,000 | JBMERGE | 24,000 |
| | | | Macesic, Milan | 4,000 | JBMERGE | 4,000 |
| | | | Macesic, Milja | 4,000 | JBMERGE | 4,000 |
| | | | MacGregor, Ian | 46,000 | JBMERGE | 46,000 |
| | | | MacGregor, Jeannette | 10,000 | JBMERGE | 10,000 |
| | | | Mackinnon, Carol Ann | 2,000 | JBMERGE | 2,000 |
| | | | MacLaren, Glenn | 100,000 | JBMERGE | 100,000 |
| | | | Malivuk, Milan | 30,000 | JBMERGE | 30,000 |
| | | | Martin, Patricia | 20,000 | JBMERGE | 20,000 |
| | | | Martino, Maria | 15,000 | JBMERGE | 15,000 |
| | | | Martino, Rocco | 15,000 | JBMERGE | 15,000 |
| | | | Martyn, Bonnie | 3,000 | JBMERGE | 3,000 |
| | | | Martyn, Gerald | 3,000 | JBMERGE | 3,000 |
| | | | Maskell, Scott | 10,000 | JBMERGE | 10,000 |
| | | | Mason, Peter | 4,000 | JBMERGE | 4,000 |
| | | | Matkowski, Barbara | 20,000 | JBMERGE | 20,000 |
| | | | Matkowski, David | 3,500 | JBMERGE | 3,500 |
| | | | Matkowski, Derek | 2,000 | JBMERGE | 2,000 |
| | | | Matkowski, Kathryn | 8,000 | JBMERGE | 8,000 |
| | | | Maxwell, Larry | 10,000 | JBMERGE | 10,000 |
| | | | Maxwell, Meredith | 45,000 | JBMERGE | 45,000 |
| | | | McGarry, Marion | 2,000 | JBMERGE | 2,000 |
| | | | McGaw, Dawn | 500 | JBMERGE | 500 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

## Share Transaction Journal

| Date | Disposed | | Acquired | | | Balance Now |
|------|----------|--------------|----------|--------------|----------|-------------|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | |
| | | | Mehta, Jasmin | 5,000 | JBMERGE | 5,000 |
| | | | Melchiorre, Lynn | 5,000 | JBMERGE | 5,000 |
| | | | Melchiorre, Paul | 1,000 | JBMERGE | 1,000 |
| | | | Mills, Kerry | 20,000 | JBMERGE | 20,000 |
| | | | Mitrovic, Daniela | 10,000 | JBMERGE | 10,000 |
| | | | Mitrovic, Miladin | 30,000 | JBMERGE | 30,000 |
| | | | Moldenhauer, Dean J.D. | 4,000 | JBMERGE | 4,000 |
| | | | Mrkalj, Andjelko | 18,000 | JBMERGE | 18,000 |
| | | | Myers, Howard | 20,000 | JBMERGE | 20,000 |
| | | | Nicholson, Donna | 5,000 | JBMERGE | 5,000 |
| | | | Optic Light | 10,000 | JBMERGE | 10,000 |
| | | | Orescanin (In-Trust Grandchildren), Λ | 4,000 | JBMERGE | 4,000 |
| | | | Orescanin, Daniel | 1,000 | JBMERGE | 1,000 |
| | | | Orescanin, John | 5,000 | JBMERGE | 5,000 |
| | | | Orescanin, Mary | 1,000 | JBMERGE | 1,000 |
| | | | Orescanin, Mildred | 145,000 | JBMERGE | 145,000 |
| | | | Orescanin, Nathan | 1,000 | JBMERGE | 1,000 |
| | | | Pang Jr., Peter Allen | 8,000 | JBMERGE | 8,000 |
| | | | Paskey, Cindy | 90,000 | JBMERGE | 90,000 |
| | | | Pieterse, Frank | 32,000 | JBMERGE | 32,000 |
| | | | Pinder, Wendy | 391,000 | JBMERGE | 391,000 |
| | | | Pinder-Doede, Caitlin | 2,500 | JBMERGE | 2,500 |
| | | | Pinder-Doede, Carrie | 2,500 | JBMERGE | 2,500 |
| | | | Pirsich, Stephan | 2,000 | JBMERGE | 2,000 |
| | | | Pirsich, Steve | 5,000 | JBMERGE | 5,000 |
| | | | Plante, Chad | 2,000 | JBMERGE | 2,000 |
| | | | Plante, Sabrina | 2,500 | JBMERGE | 2,500 |
| | | | Pompetzki, Monika | 140,000 | JBMERGE | 140,000 |
| | | | Popovacki, Carol | 10,000 | JBMERGE | 10,000 |
| | | | Popovacki, John | 50,000 | JBMERGE | 50,000 |
| | | | Popovich, Dara | 2,000 | JBMERGE | 2,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

## Share Transaction Journal

| Date | Disposed | | Acquired | | | Balance Now |
|------|----------|--------------|---------------------|--------------|---------|-------------|
|      | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? |  |
|  |  |  | Popovich, Dusan | 20,000 | JBMERGE | 20,000 |
|  |  |  | Prytula, Linda | 68,000 | JBMERGE | 68,000 |
|  |  |  | Przybysz, Irene | 50,000 | JBMERGE | 50,000 |
|  |  |  | Radojevic, Lidija | 4,000 | JBMERGE | 4,000 |
|  |  |  | Rice, Keri Frances | 20,000 | JBMERGE | 20,000 |
|  |  |  | Richard Jr., Gerard | 20,000 | JBMERGE | 20,000 |
|  |  |  | Richard, Diane | 200,000 | JBMERGE | 200,000 |
|  |  |  | Richard, Yvette | 20,000 | JBMERGE | 20,000 |
|  |  |  | Richards, Bill | 30,000 | JBMERGE | 30,000 |
|  |  |  | Robbins, Glenn | 3,000 | JBMERGE | 3,000 |
|  |  |  | Robbins, Kristen | 1,000 | JBMERGE | 1,000 |
|  |  |  | Robbins, Lara | 2,000 | JBMERGE | 2,000 |
|  |  |  | Robbins, Valentina | 3,000 | JBMERGE | 3,000 |
|  |  |  | Robinson, Barbara | 2,000 | JBMERGE | 2,000 |
|  |  |  | Rogers, Stephanie | 2,000 | JBMERGE | 2,000 |
|  |  |  | Romanek, Sharron | 3,000 | JBMERGE | 3,000 |
|  |  |  | Roth, James D. | 10,000 | JBMERGE | 10,000 |
|  |  |  | Rouillier, Lise | 3,000 | JBMERGE | 3,000 |
|  |  |  | Roy, Richard | 50,000 | JBMERGE | 50,000 |
|  |  |  | Rusic, Bosiljka | 1,000 | JBMERGE | 1,000 |
|  |  |  | Rusic, Dragon (Danny) | 1,000 | JBMERGE | 1,000 |
|  |  |  | Saccone, Len | 5,000 | JBMERGE | 5,000 |
|  |  |  | Samdass, James | 4,000 | JBMERGE | 4,000 |
|  |  |  | Schertzing, Bert | 25,000 | JBMERGE | 25,000 |
|  |  |  | Schertzing, Christine | 25,000 | JBMERGE | 25,000 |
|  |  |  | Seburn, Brian | 75,000 | JBMERGE | 75,000 |
|  |  |  | Seburn, Janice | 2,000 | JBMERGE | 2,000 |
|  |  |  | Senese, Karen | 2,000 | JBMERGE | 2,000 |
|  |  |  | Senske, Jerrold | 4,000 | JBMERGE | 4,000 |
|  |  |  | Smith, James H. | 20,000 | JBMERGE | 20,000 |
|  |  |  | Smudja, Zeljko | 6,000 | JBMERGE | 6,000 |

John Bordynuik Inc (Expedite 2 - Delaware)

Share Transaction Journal

27 Sept 2007 through 27 July 2009

| Date | Disposed Name of Shareholder | No. of Shares | Acquired Name of Shareholder | No. of Shares | How? | Balance Now |
|------|------|------|------|------|------|------|
| | | | Spadotto, Michael | 20,000 | JBMERGE | 20,000 |
| | | | Srdjenovic, Nedeljko | 4,000 | JBMERGE | 4,000 |
| | | | Stanojcic, Andja | 2,000 | JBMERGE | 2,000 |
| | | | Stark, Amy | 2,000 | JBMERGE | 2,000 |
| | | | Stark, Doris | 20,000 | JBMERGE | 20,000 |
| | | | Stark, Juliana | 2,000 | JBMERGE | 2,000 |
| | | | Stark, Laura | 4,000 | JBMERGE | 4,000 |
| | | | Stark, Lisa | 10,000 | JBMERGE | 10,000 |
| | | | Stark, Malcolm | 326,500 | JBMERGE | 326,500 |
| | | | Stark, Pamela | 6,000 | JBMERGE | 6,000 |
| | | | Stark, William | 60,000 | JBMERGE | 60,000 |
| | | | Stark-Chevers, Roberta | 20,000 | JBMERGE | 20,000 |
| | | | Stathourakis, Eugenia V. | 1,000 | JBMERGE | 1,000 |
| | | | Steip, Ronald | 11,000 | JBMERGE | 11,000 |
| | | | Stoll, Joan | 4,000 | JBMERGE | 4,000 |
| | | | Tsiantoulas, Christos | 4,000 | JBMERGE | 4,000 |
| | | | Tsiantoulas, Katherine | 12,000 | JBMERGE | 12,000 |
| | | | Tsiantoulas, Nicola | 2,000 | JBMERGE | 2,000 |
| | | | Tunstall, Charlotte | 2,000 | JBMERGE | 2,000 |
| | | | Utvich (In-Trust Amelia Rae Utvich), ( | 2,000 | JBMERGE | 2,000 |
| | | | Utvich Jr., Michael E. | 2,000 | JBMERGE | 2,000 |
| | | | Utvich Sr., Michael E. | 2,000 | JBMERGE | 2,000 |
| | | | Utvich, Danica | 10,000 | JBMERGE | 10,000 |
| | | | Utvich, Daryl A. | 2,000 | JBMERGE | 2,000 |
| | | | Utvich, David | 2,000 | JBMERGE | 2,000 |
| | | | Utvich, Gregory T. | 2,000 | JBMERGE | 2,000 |
| | | | Utvich, Judith | 1,000 | JBMERGE | 1,000 |
| | | | Utvich, Lauren | 2,000 | JBMERGE | 2,000 |
| | | | Utvich, Melissa E. | 2,000 | JBMERGE | 2,000 |
| | | | Van Dongen, Cory | 10,000 | JBMERGE | 10,000 |
| | | | Van Dongen, Wilhelmus | 10,000 | JBMERGE | 10,000 |

**John Bordynuik Inc (Expedite 2 - Delaware)**

**Share Transaction Journal**

**27 Sept 2007 through 27 July 2009**

| Date | Disposed | | Acquired | | | Balance Now |
|------|----------|--|----------|--|--|-------------|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | |
| | | | Vandewater, Carolyn | 5,000 | JBMERGE | 5,000 |
| | | | Varcoe, Ryland | 2,000 | JBMERGE | 2,000 |
| | | | Varcoe, Scott | 4,000 | JBMERGE | 4,000 |
| | | | Velemirovich, Dragica | 2,000 | JBMERGE | 2,000 |
| | | | Vujic, Branislav | 2,000 | JBMERGE | 2,000 |
| | | | Water Communications Inc. | 400,000 | JBMERGE | 400,000 |
| | | | Weir, Ludmilla | 10,000 | JBMERGE | 10,000 |
| | | | Widdis, Patricia J. | 516,530 | JBMERGE | 516,530 |
| | | | Wright, Grant | 160,000 | JBMERGE | 160,000 |
| | | | Yelda, Dany | 4,000 | JBMERGE | 4,000 |
| | | | Yole, Leslie | 8,000 | JBMERGE | 8,000 |
| | | | Yorke, Steven | 10,000 | JBMERGE | 10,000 |
| | | | Zubic, Tihomir | 4,000 | JBMERGE | 4,000 |
| 11-Jun-09 ($1 Corrections/Omissions) | | | Bordynuik, Marjorie | 10,000 | JBMERGE | 10,000 |
| | | | Budd, Brian | 8,333 | JBMERGE | 8,333 |
| | | | Gama, Rui | 60,000 | JBMERGE | 60,000 |
| | | | Healey, Michael | 14,500 | JBMERGE | 14,500 |
| | | | Henningsen, Evelyn | 40,000 | JBMERGE | 40,000 |
| | | | Kvas, Anton | 20,000 | JBMERGE | 20,000 |
| | | | Lefebvre Michelle | 100,000 | JBMERGE | 100,000 |
| | | | Litalien, Jack | 16,000 | JBMERGE | 16,000 |
| | | | McLachlin, Paul | 70,000 | JBMERGE | 70,000 |
| | | | Moore, Cynthia | 120,000 | JBMERGE | 120,000 |
| | | | Morrison, Jim | 60,000 | JBMERGE | 60,000 |
| | | | Orescanin, Joco | 17,833 | JBMERGE | 17,833 |
| | | | Remus, Stephen | 10,000 | JBMERGE | 10,000 |
| | | | Richards, Bill | 15,000 | JBMERGE | 45,000 |
| | | | Riddle, Dave | 68,334 | JBMERGE | 68,334 |
| | | | Towne, Katharine | 100,000 | JBMERGE | 100,000 |
| | | | Walters, Sandra | 43,500 | JBMERGE | 43,500 |

| Date | Disposed | | Acquired | | How? | Balance Now |
|---|---|---|---|---|---|---|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | | |
| 12-Jun-09 | Bagley, Brenda | 50,000 | | | TRANS | 0 |
| | Prytula, Linda | 68,000 | | | TRANS | 0 |
| | | | Coy, Frank | | TRANS | 118,000 |
| | | | | | | |
| 30-Jun-09 | 1264282 Ontario Ltd. (Jade Amusem | 8,000 | | | 310-Purch | 0 |
| | 1515437 Ontario Inc. | 200,000 | | | 310-Purch | 0 |
| | Albano, Bruno | 2,000 | | | 310-Purch | 0 |
| | Anthes (In-trust Emily C. Anthes), Thr | 16,000 | | | 310-Purch | 0 |
| | Anthes, Colin B. | 20,000 | | | 310-Purch | 0 |
| | Anthes, Fiona | 16,000 | | | 310-Purch | 0 |
| | Anthes, Thomas Victor | 350,000 | | | 310-Purch | 0 |
| | Barnett, Alan | 402,600 | | | 310-Purch | 0 |
| | Barnett, Holly | 24,000 | | | 310-Purch | 0 |
| | Barnett, Tom | 6,000 | | | 310-Purch | 0 |
| | Beam, Janet | 4,000 | | | 310-Purch | 0 |
| | Beni, Mildred | 3,000 | | | 310-Purch | 0 |
| | Best Real Estate Buy Inc. | 30,000 | | | 310-Purch | 0 |
| | Biamonte, Joseph | 10,000 | | | 310-Purch | 0 |
| | Biamonte, Napoleon | 122,000 | | | 310-Purch | 0 |
| | Biamonte, Ralph | 5,000 | | | 310-Purch | 0 |
| | Biamonte, Sarah | 2,000 | | | 310-Purch | 0 |
| | Bjorgan, Chris | 2,000 | | | 310-Purch | 0 |
| | Bordynuik Sr., John | 300,000 | | | 310-300K/SE | 1,700,000 |
| | Bordynuik, Janet | 2,000 | | | 310-Purch | 0 |
| | Bordynuik, John | | | | N/A | 36,308,345 |
| | Bordynuik, Marjorie | 10,000 | | | 310-Purch | 0 |
| | Boric, Dean | 44,000 | | | 310-Purch | 0 |
| | Boric, Doug | 8,000 | | | 310-Purch | 0 |
| | Boric, Douglas | 8,000 | | | 310-Purch | 0 |
| | Bosche, Donalda | 30,000 | | | 310-Purch | 0 |
| | Bosco, Kelly | 10,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

Share Transaction Journal

27 Sept 2007 through 27 July 2009

| Date | Disposed Name of Shareholder | No. of Shares | Acquired Name of Shareholder | No. of Shares | How? | Balance Now |
|---|---|---|---|---|---|---|
| | Bosco, Larry | 10,000 | | | 310-Purch | 0 |
| | Bourbonnais, Mike | 20,000 | | | 310-Purch | 0 |
| | Brain, Kevin | 116,000 | | | 310-Purch | 0 |
| | Brewster, Donna | 3,000 | | | 310-Purch | 0 |
| | Brock, Erwin | 2,000 | | | 310-Purch | 0 |
| | Brown, Christopher | 4,000 | | | 310-Purch | 0 |
| | Brown, Ian | 200,000 | | | 310-Purch | 0 |
| | Brown, Tina | 200,000 | | | 310-Purch | 0 |
| | Budd, Brian | 8,333 | | | 310-Purch | 0 |
| | Byford, Dennis | 6,000 | | | 310-Purch | 0 |
| | Candler, Curt | 20,000 | | | 310-Purch | 0 |
| | Caputo, Marie | 55,000 | | | 310-Purch | 0 |
| | Cavanagh, Christine | 2,000 | | | 310-Purch | 0 |
| | Chevalier, Wayne Thomas | 20,000 | | | 310-Purch | 0 |
| | Clarke, Steve | 2,000 | | | 310-Purch | 0 |
| | Cooper, Richard | 1,000 | | | 310-Purch | 0 |
| | Corp. 168309 tst | 300,000 | | | 310-300K/SE | 1,200,000 |
| | Coy, Frank | 118,000 | | | 310-Purch | 0 |
| | Craig, Kathryn | 15,000 | | | 310-Purch | 0 |
| | Crown, Heather | 1,000 | | | 310-Purch | 0 |
| | Cucuz (In Trust-Juliana Cucuz), Nada | 2,000 | | | 310-Purch | 0 |
| | Cucuz, Dragoljub | 1,000 | | | 310-Purch | 0 |
| | Cucuz, Nada | 1,000 | | | 310-Purch | 0 |
| | Culliford, Keith | 1,400 | | | 310-Purch | 0 |
| | Cummings, Stephen | 20,000 | | | 310-Purch | 0 |
| | Cushing, Catherine | 20,000 | | | 310-Purch | 0 |
| | Cushing, Robert | 20,000 | | | 310-Purch | 0 |
| | D'Amico, Michael | 10,000 | | | 310-Purch | 0 |
| | Deurloo, Beverley Joan | 120,000 | | | 310-Purch | 0 |
| | Dickson, Lorraine | 10,000 | | | 310-Purch | 0 |
| | Dixon, Betty | 2,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Name of Shareholder | Disposed No. of Shares | Acquired Name of Shareholder | No. of Shares | How? | Balance Now |
|------|---------------------|------------------------|------------------------------|---------------|------|-------------|
| | Doede, Steve | 300,000 | | | 310-300K/SE | 1,400,000 |
| | D'orazio( In-trust Samara & Lucas Jef | 10,000 | | | 310-Purch | 0 |
| | D'Orazio, Marina | 46,875 | | | 310-Purch | 0 |
| | Dorey, Jeffrey | 8,000 | | | 310-Purch | 0 |
| | Drapeau, Lynn | 0 | | | NOTRANS | 10,000 |
| | Dutton, Evan | 80,000 | | | 310-Purch | 0 |
| | Elsley (In-trust Kristin Elsley), Sandra | 3,000 | | | 310-Purch | 0 |
| | Elsley, Sandra | 300,000 | | | 310-300K/SE | 7,450,000 |
| | Esposito, Christina | 1,000 | | | 310-Purch | 0 |
| | Evans, Catherine | 1,000 | | | 310-Purch | 0 |
| | Evans, David | 35,000 | | | 310-Purch | 0 |
| | Evans, Gordon | 4,000 | | | 310-Purch | 0 |
| | Evans, Michael | 1,000 | | | 310-Purch | 0 |
| | Evans, Robin | 120,000 | | | 310-Purch | 0 |
| | Evans,Wendy | 150,000 | | | 310-Purch | 0 |
| | Everson, Connie | 8,000 | | | 310-Purch | 0 |
| | Falconer, Frank | 20,000 | | | 310-Purch | 0 |
| | Farrington, Pamela L. | 2,000 | | | 310-Purch | 0 |
| | Ferrante, Theresa C. | 12,000 | | | 310-Purch | 0 |
| | Finch, Raymond | 3,000 | | | 310-Purch | 0 |
| | Finch, Ruth | 3,000 | | | 310-Purch | 0 |
| | Forsyth, Jeffrey | 50,000 | | | 310-Purch | 0 |
| | Forsyth, Victoria | 50,000 | | | 310-Purch | 0 |
| | Gallo, Roy | 40,000 | | | 310-Purch | 0 |
| | Gama, Rui | 60,000 | | | 310-Purch | 0 |
| | Gatto, Nikkie | 1,000 | | | 310-Purch | 0 |
| | Gerhardt, Kent | 5,000 | | | 310-Purch | 0 |
| | Gisel, Tara | 2,000 | | | 310-Purch | 0 |
| | Goodyear, Charles | 114,000 | | | 310-Purch | 0 |
| | Goodyear, Hope | 2,000 | | | 310-Purch | 0 |
| | Gordon, Rachael | 4,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Disposed | | Acquired | | How? | Balance Now |
|------|----------|--|----------|--|------|-------------|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | | |
| | Gorman, Sheri | 4,250 | | | 310-Purch | 0 |
| | Green, Michael | 170,000 | | | 310-Purch | 0 |
| | Harris, Barbara | 8,000 | | | 310-Purch | 0 |
| | Harry Fois Poultry Farms | 40,000 | | | 310-Purch | 0 |
| | Haskell, David | 1,000 | | | 310-Purch | 0 |
| | Haskell, Nancy | 3,000 | | | 310-Purch | 0 |
| | Healey, Michael | 14,500 | | | 310-Purch | 0 |
| | Henningsen, Evelyn | 40,000 | | | 310-Purch | 0 |
| | Hrin, Peter | 50,000 | | | 310-Purch | 0 |
| | Hunter, Gillies | 300,000 | | | 310-Purch | 0 |
| | Hunter, Karen | 4,000 | | | 310-Purch | 0 |
| | IP Trust | 300,000 | | | 310-300K/SE | 1,200,000 |
| | Jewell, Pat | 2,000 | | | 310-Purch | 0 |
| | Johnson, Scott | 66,000 | | | 310-Purch | 0 |
| | Jordan, Earl T. | 20,000 | | | 310-Purch | 0 |
| | Jovanovic, Mirko | 20,000 | | | 310-Purch | 0 |
| | Kafal, Adam | 2,750 | | | 310-Purch | 0 |
| | Kafal, Paul | 45,250 | | | 310-Purch | 0 |
| | Kafal, Peter | 100,000 | | | 310-Purch | 0 |
| | Kajganich (In-Trust Bradley Kajganich | 1,000 | | | 310-Purch | 0 |
| | Kajganich, Anne | 2,000 | | | 310-Purch | 0 |
| | Kajganich, Joanne | 1,000 | | | 310-Purch | 0 |
| | Kajganich, Michael | 1,000 | | | 310-Purch | 0 |
| | Kajganich, Nicholas | 1,000 | | | 310-Purch | 0 |
| | Kandasamy, Fay | 120,000 | | | 310-Purch | 0 |
| | Kandasamy, Gerald | 80,000 | | | 310-Purch | 0 |
| | Kandasamy, Keith | 17,000 | | | 310-Purch | 0 |
| | Kelly (In Trust-Scarlett Kelly), Mary | 5,000 | | | 310-Purch | 0 |
| | Kelly, Mary | 7,000 | | | 310-Purch | 0 |
| | Kelly, Patrick | 7,000 | | | 310-Purch | 0 |
| | Kelly, Patrick Thomas | 1,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Disposed Name of Shareholder | No. of Shares | Acquired Name of Shareholder | No. of Shares | How? | Balance Now |
|---|---|---|---|---|---|---|
| | Kent, R. Gordon | 40,000 | | | 310-Purch | 0 |
| | Kobryn, David | 20,000 | | | 310-Purch | 0 |
| | Kobryn, Scott | 30,000 | | | 310-Purch | 0 |
| | Krkljus, Mile | 10,000 | | | 310-Purch | 0 |
| | Kvas, Anton | 10,000 | | | 310-Purch | 0 |
| | Kvas, Anton | 20,000 | | | 310-Purch | 0 |
| | Lahaie, Mike | 2,000 | | | 310-Purch | 0 |
| | Lane, Jennifer | 250 | | | 310-Purch | 0 |
| | Lane, Jeremy | 100,000 | | | 310-Purch | 0 |
| | Latinovic, Boro | 2,000 | | | 310-Purch | 0 |
| | Lazaroski, Dejan | 6,000 | | | 310-Purch | 0 |
| | Lefebvre Michelle | 100,000 | | | 310-Purch | 0 |
| | Litalien, Connie | 35,000 | | | 310-Purch | 0 |
| | Litalien, Jack | 16,000 | | | 310-Purch | 0 |
| | Litalien, Trisha | 10,000 | | | 310-Purch | 0 |
| | Macesic, Branko | 24,000 | | | 310-Purch | 0 |
| | Macesic, Milan | 4,000 | | | 310-Purch | 0 |
| | Macesic, Milja | 4,000 | | | 310-Purch | 0 |
| | MacGregor, Ian | 46,000 | | | 310-Purch | 0 |
| | MacGregor, Jeannette | 10,000 | | | 310-Purch | 0 |
| | Mackinnon, Carol Ann | 2,000 | | | 310-Purch | 0 |
| | MacLaren, Glenn | 100,000 | | | 310-Purch | 0 |
| | Maliuk, Milan | 30,000 | | | 310-Purch | 0 |
| | Martin, Patricia | 20,000 | | | 310-Purch | 0 |
| | Martino, Maria | 15,000 | | | 310-Purch | 0 |
| | Martino, Rocco | 15,000 | | | 310-Purch | 0 |
| | Martyn, Bonnie | 3,000 | | | 310-Purch | 0 |
| | Martyn, Gerald | 3,000 | | | 310-Purch | 0 |
| | Maskell, Scott | 10,000 | | | 310-Purch | 0 |
| | Mason, Peter | 4,000 | | | 310-Purch | 0 |
| | Matkowski, Barbara | 20,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Name of Shareholder (Disposed) | No. of Shares | Name of Shareholder (Acquired) | No. of Shares | How? | Balance Now |
|---|---|---|---|---|---|---|
| | Matkowski, David | 3,500 | | | 310-Purch | 0 |
| | Matkowski, Derek | 2,000 | | | 310-Purch | 0 |
| | Matkowski, Kathryn | 8,000 | | | 310-Purch | 0 |
| | Maxwell, Larry | 10,000 | | | 310-Purch | 0 |
| | Maxwell, Meredith | 45,000 | | | 310-Purch | 0 |
| | McGarry, Marion | 2,000 | | | 310-Purch | 0 |
| | McGaw, Dawn | 500 | | | 310-Purch | 0 |
| | McLachlin, Paul | 70,000 | | | 310-Purch | 0 |
| | Mehta, Jasmin | 5,000 | | | 310-Purch | 0 |
| | Melchiorre, Lynn | 5,000 | | | 310-Purch | 0 |
| | Melchiorre, Paul | 1,000 | | | 310-Purch | 0 |
| | Mills, Kerry | 20,000 | | | 310-Purch | 0 |
| | Mitrovic, Daniela | 10,000 | | | 310-Purch | 0 |
| | Mitrovic, Miladin | 30,000 | | | 310-Purch | 0 |
| | Moldenhauer, Dean J.D. | 4,000 | | | 310-Purch | 0 |
| | Moore, Cynthia | 120,000 | | | 310-Purch | 0 |
| | Morrison, Jim | 60,000 | | | 310-Purch | 0 |
| | Mrkalj, Andjelko | 18,000 | | | 310-Purch | 0 |
| | Myers, Howard | 20,000 | | | 310-Purch | 0 |
| | Nicholson, Donna | 5,000 | | | 310-Purch | 0 |
| | Optic Light | 10,000 | | | 310-Purch | 0 |
| | Orescanin (In-Trust Grandchildren), A | 4,000 | | | 310-Purch | 0 |
| | Orescanin, Daniel | 1,000 | | | 310-Purch | 0 |
| | Orescanin, Joco | 17,833 | | | 310-Purch | 0 |
| | Orescanin, John | 5,000 | | | 310-Purch | 0 |
| | Orescanin, Mary | 1,000 | | | 310-Purch | 0 |
| | Orescanin, Mildred | 145,000 | | | 310-Purch | 0 |
| | Orescanin, Nathan | 1,000 | | | 310-Purch | 0 |
| | Pang Jr., Peter Allen | 8,000 | | | 310-Purch | 0 |
| | Paskey, Cindy | 90,000 | | | 310-Purch | 0 |
| | Pieterse, Frank | 32,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

Share Transaction Journal

27 Sept 2007 through 27 July 2009

| Date | Disposed | | Acquired | | | Balance Now |
|---|---|---|---|---|---|---|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | How? | |
| | Pinder, Wendy | 391,000 | | | 310-Purch | 0 |
| | Pinder-Doede, Caitlin | 2,500 | | | 310-Purch | 0 |
| | Pinder-Doede, Carrie | 2,500 | | | 310-Purch | 0 |
| | Pirsich, Stephan | 2,000 | | | 310-Purch | 0 |
| | Pirsich, Steve | 5,000 | | | 310-Purch | 0 |
| | Plante, Chad | 2,000 | | | 310-Purch | 0 |
| | Plante, Sabrina | 2,500 | | | 310-Purch | 0 |
| | Pompetzki, Monika | 140,000 | | | 310-Purch | 0 |
| | Popovacki, Carol | 10,000 | | | 310-Purch | 0 |
| | Popovacki, John | 50,000 | | | 310-Purch | 0 |
| | Popovich, Dara | 2,000 | | | 310-Purch | 0 |
| | Popovich, Dusan | 20,000 | | | 310-Purch | 0 |
| | Przybysz, Irene | 50,000 | | | 310-Purch | 0 |
| | Radojevic, Lidija | 4,000 | | | 310-Purch | 0 |
| | Remus, Stephen | 10,000 | | | 310-Purch | 0 |
| | Rice, Keri Frances | 20,000 | | | 310-Purch | 0 |
| | Richard Jr., Gerard | 20,000 | | | 310-Purch | 0 |
| | Richard, Diane | 200,000 | | | 310-Purch | 0 |
| | Richard, Yvette | 20,000 | | | 310-Purch | 0 |
| | Richards, Bill | 45,000 | | | 310-Purch | 0 |
| | Riddle, Dave | 68,334 | | | 310-Purch | 0 |
| | Robbins, Glenn | 3,000 | | | 310-Purch | 0 |
| | Robbins, Kristen | 1,000 | | | 310-Purch | 0 |
| | Robbins, Lara | 2,000 | | | 310-Purch | 0 |
| | Robbins, Valentina | 3,000 | | | 310-Purch | 0 |
| | Robinson, Barbara | 2,000 | | | 310-Purch | 0 |
| | Rogers, Stephanie | 2,000 | | | 310-Purch | 0 |
| | Romanek, Sharron | 3,000 | | | 310-Purch | 0 |
| | Roth, James D. | 10,000 | | | 310-Purch | 0 |
| | Rouillier, Lise | 3,000 | | | 310-Purch | 0 |
| | Roy, Richard | 50,000 | | | 310-Purch | 0 |

John Bordynuik Inc (Expedite 2 - Delaware)

Share Transaction Journal

27 Sept 2007 through 27 July 2009

| Date | Disposed | | Acquired | | How? | Balance Now |
|------|----------|--------------|----------|--------------|------|-------------|
| | Name of Shareholder | No. of Shares | Name of Shareholder | No. of Shares | | |
| | Rusic, Bosiljka | 1,000 | | | 310-Purch | 0 |
| | Rusic, Dragon (Danny) | 1,000 | | | 310-Purch | 0 |
| | Saccone, Len | 5,000 | | | 310-Purch | 0 |
| | Samdass, James | 4,000 | | | 310-Purch | 0 |
| | Schertzing, Bert | 25,000 | | | 310-Purch | 0 |
| | Schertzing, Christine | 25,000 | | | 310-Purch | 0 |
| | Seburn, Brian | 75,000 | | | 310-Purch | 0 |
| | Seburn, Janice | 2,000 | | | 310-Purch | 0 |
| | Senese, Karen | 2,000 | | | 310-Purch | 0 |
| | Senske, Jerrold | 4,000 | | | 310-Purch | 0 |
| | Smith, James H. | 20,000 | | | 310-Purch | 0 |
| | Smudja, Zeljko | 6,000 | | | 310-Purch | 0 |
| | Spadotto, Michael | 20,000 | | | 310-Purch | 0 |
| | Srdjenovic, Nedeljko | 4,000 | | | 310-Purch | 0 |
| | Stanojcic, Andja | 2,000 | | | 310-Purch | 0 |
| | Stark, Amy | 2,000 | | | 310-Purch | 0 |
| | Stark, Doris | 20,000 | | | 310-Purch | 0 |
| | Stark, Juliana | 2,000 | | | 310-Purch | 0 |
| | Stark, Laura | 4,000 | | | 310-Purch | 0 |
| | Stark, Lisa | 10,000 | | | 310-Purch | 0 |
| | Stark, Malcolm | 326,500 | | | 310-Purch | 0 |
| | Stark, Pamela | 6,000 | | | 310-Purch | 0 |
| | Stark, William | 60,000 | | | 310-Purch | 0 |
| | Stark-Chevers, Roberta | 20,000 | | | 310-Purch | 0 |
| | Stathourakis, Eugenia V. | 1,000 | | | 310-Purch | 0 |
| | Steip, Ronald | 11,000 | | | 310-Purch | 0 |
| | Stoll, Joan | 4,000 | | | 310-Purch | 0 |
| | Towne, Katharine | 100,000 | | | 310-Purch | 0 |
| | Tsiantoulas, Christos | 4,000 | | | 310-Purch | 0 |
| | Tsiantoulas, Katherine | 12,000 | | | 310-Purch | 0 |
| | Tsiantoulas, Nicola | 2,000 | | | 310-Purch | 0 |

17 of 18

John Bordynuik Inc (Expedite 2 - Delaware)

27 Sept 2007 through 27 July 2009

Share Transaction Journal

| Date | Name of Shareholder | Disposed No. of Shares | Name of Shareholder | Acquired No. of Shares | How? | Balance Now |
|---|---|---|---|---|---|---|
| | Tunstall, Charlotte | 2,000 | | | 310-Purch | 0 |
| | Utvich (In-Trust Amelia Rae Utvich), I | 2,000 | | | 310-Purch | 0 |
| | Utvich Jr., Michael E. | 2,000 | | | 310-Purch | 0 |
| | Utvich Sr., Michael E. | 2,000 | | | 310-Purch | 0 |
| | Utvich, Danica | 10,000 | | | 310-Purch | 0 |
| | Utvich, Daryl A. | 2,000 | | | 310-Purch | 0 |
| | Utvich, David | 2,000 | | | 310-Purch | 0 |
| | Utvich, Gregory T. | 2,000 | | | 310-Purch | 0 |
| | Utvich, Judith | 1,000 | | | 310-Purch | 0 |
| | Utvich, Lauren | 2,000 | | | 310-Purch | 0 |
| | Utvich, Melissa E. | 2,000 | | | 310-Purch | 0 |
| | Van Dongen, Cory | 10,000 | | | 310-Purch | 0 |
| | Van Dongen, Wilhelmus | 10,000 | | | 310-Purch | 0 |
| | Vandewater, Carolyn | 5,000 | | | 310-Purch | 0 |
| | Varcoe, Ryland | 2,000 | | | 310-Purch | 0 |
| | Varcoe, Scott | 4,000 | | | 310-Purch | 0 |
| | Velemirovich, Dragica | 2,000 | | | 310-Purch | 0 |
| | Vujic, Branislav | 2,000 | | | 310-Purch | 0 |
| | Walters, Sandra | 43,500 | | | 310-Purch | 0 |
| | Water Communications Inc. | 400,000 | | | 310-Purch | 0 |
| | Weir, Ludmilla | 10,000 | | | 310-Purch | 0 |
| | Widdis, Patricia J. | 516,530 | | | 310-Purch | 0 |
| | Wright, Grant | 160,000 | | | 310-Purch | 0 |
| | Yelda, Dany | 4,000 | | | 310-Purch | 0 |
| | Yole, Leslie | 8,000 | | | 310-Purch | 0 |
| | Yorke, Steven | 10,000 | | | 310-Purch | 0 |
| | Zubic, Tihomir | 4,000 | | | 310-Purch | 0 |

**EXHIBIT 3**

COURT FILE COPY


ELSLEY v. BORDYNUIK

COURT FILE NO. CV-12-2474-00


CROSS-EXAMINATION OF
SANDRA L. ELSLEY

January 31, 2013


Nimigan Mihailovich Reporting
Hamilton, Ontario - 905 522-1653 - www.nmreporting.ca

1

COPY

Court File No. CV-12-2474-00

Welland Court File 6312/12

ONTARIO

SUPERIOR COURT OF JUSTICE

B E T W E E N:

SANDRA ELSLEY,

Moving Party/Plaintiff,

- and -

JOHN BORDYNUIK,

Respondent/Defendant.

--- **This is the Cross-Examination of SANDRA LYNN ELSLEY, the Moving Party/Plaintiff, on her Affidavit sworn December 18, 2012,** taken at the offices of Nimigan Mihailovich Reporting, One James Street South, Suite 701, Hamilton, Ontario, L8P 4R5, **on Thursday, the 31st day of January, 2013.**

APPEARANCES:

Frederick S. Hawa        For the Plaintiff

Mark Abradjian           For the Defendant

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          2

---

## TABLE OF CONTENTS

INDEX OF EXAMINATIONS:

SANDRA ELSLEY; Sworn. . . . . . . . . . . . . . . .    3

CROSS-EXAMINATION BY MR. ABRADJIAN: . . . . . . . . .    3


### INDEX OF UNDERTAKINGS

Undertakings are noted by U/T and are found on the following pages:  17, 35, 62, 67, 92


### INDEX OF REFUSALS

Refusals are noted by R/F and are found on the following pages: 81


### INDEX OF UNDER ADVISEMENT QUESTIONS

Under advisement questions are noted by U/A and are found on the following pages:  72

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013                SANDRA L. ELSLEY                3

---Upon commencing at 11:25 a.m.

SANDRA ELSLEY; Sworn.

CROSS-EXAMINATION BY MR. ABRADJIAN:

1.      Q.  Can you state your full name, please,
for the record.

A.  Sandra Lynn Elsley.

2.      Q.  How old are you?

A.  60.

3.      Q.  Where do you live?

A.  6002 Mountain Gate Drive, Niagara
Falls, Ontario.  L2J-4H9.

4.      Q.  And how long have you lived there?

A.  Since 1993.

5.      Q.  And you were friends with Ms. Widdis
who we just finished examining?

A.  Yes.

6.      Q.  How long have you known her?

A.  Since 1988.

7.      Q.  How did you come to know her?

A.  We were interning at Interfaith
Pastoral Counselling Centre and we did a Masters in
marriage, family and child therapy together.

8.      Q.  And is that your occupation now?

A.  I'm a marriage, family and child
therapist.  I have been since 1991.

**NIMIGAN MIHAILOVICH REPORTING**

9.          Q.  Can you describe your relationship
with Ms. Widdis?

            A.  She's a friend, was a colleague, and
in 1997 I invited her to invest in our company.  She was
one of the first investors.  She provided us with loans
money.

10.         Q.  Had you ever treated or assessed
Ms. Widdis as part--

            A.  No.

11.         Q.  - of your therapy practice?

            A.  No.  But that's something that I have
to say this.  Mr. Bordynuik thought that anybody who
came into my home was a client and that was one of the
ways that he demeaned my friends and family.

12.         Q.  Did you sometimes --

            A.  And Ms. Widdis in fact provided
counselling to Mr. Bordynuik's boys and provided a
therapy report, an assessment report, for Virginia
Workman to assist him in getting custody of his
non-biological sons, which he never paid for.

13.         Q.  I appreciate that you want to give
information.  That is a cross-examination and it's just
going to go a lot quicker for everybody if you try to
listen to the questions I'm asking and answer the
questions.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley                5

                    A.  Okay.

14.            Q.  You've submitted four Affidavits
already  on this motion.

                    A.  Mm-hmm.

15.            Q.  And we're only at a motion so you'll
have a chance to tell a fuller story at the discovery if
that's what you want, but today is my opportunity to
cross-examine you on those affidavits.  Okay? Do you
understand that?

                    A.  I understand.

              MR. ABRADJIAN:  The other note I'll make
just on the record as I did with Ms. Widdis, counsel, is
that the position I think we're going to take on the
motion which I've advised you of is that really the
first Affidavit should have contained all the relevant
information based on full and frank disclosure and while
we're going ahead with examinations here that's without
prejudice to that position on the motion.

              BY MR. ABRADJIAN:

16.            Q.  If there are any questions that I ask
you that are unclear, please let me know and I'll
rephrase it OR clarify it.  Otherwise I'll assume you
understand the question and I'll take your answer.

                    A.  Okay.  I understand.

17.            Q.  Did you sometimes carry on your

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley                    6

practice as a marriage counsellor or a therapist while you were involved with JBI companies in whatever iteration?

        A.  Did you say sometimes?

18.        Q.  Yes.

        A.  I did both until 2008.

19.        Q.  And would you sometimes work on your JBI business, if I can call it that, while you were at home or at your counselling office and sometimes work on your counselling stuff while you were at the JBI offices? Did you delineate?

        A.  No.  Maybe one percent of the time but otherwise when I was at my Mountain Gate residence I worked in my practice and then I would fly over to the JBI corporate office and work there.

20.        Q.  There was some overlap but very, very little is what you're saying?

        A.  A phone call would have been the kind of overlap.

21.        Q.  So with Ms. Widdis, did you help her with an assessment after she had a motor vehicle accident?  Did you do an assessment of her?

        A.  What does that have to do with this?

22.        Q.  Well, you told me that you hadn't assessed her.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          7

    A. Mm-hmm.  No, I told you I hadn't counselled her.

23.   Q. Had you assessed her?

    A. I don't recall.  What year was that?

24.   Q. I'm going to ask you.

    A. I don't recall.

25.   Q. Do you remember coming to conclusions with respect to her symptoms and the types of medication she was on, that she had memory problems?

    A. I do that.  I do remember that.  She was heavily medicated at that time and my recommendation was that she needed to come off all on those medications.  They were contraindicated indicated for her.  I'm not a doctor, I'm not qualified to say that but it was my opinion that that needed to be looked into that.  I do remember that now.

26.   Q. So you do remember now having assessed her?

    A. Yes.

27.   Q. You assessed her?

    A. Providing an assessment for whoever, yes.

28.   Q. And in fact you did a report?

    A. In fact I did a report.

29.   Q. And is it possible that you did that

**NIMIGAN MIHAILOVICH REPORTING**

report on the computer at JBI?

           A.  Or it could have been a computer that was stolen from my house that was brought to JBI's.

30.        Q.  It could have been one or the other?

           A.  It could have been one or the other.

31.        Q.  And in that report do you recall saying that Ms. Widdis suffered from mental confusion?

           A.  I would have said that if somebody was using a lot of drugs.

32.        Q.  And also memory problems?

           A.  Yes.  I would have said that, too. If somebody was using a lot-drugs, prescribed drugs, absolutely because that what happens.

33.        Q.  And did you attribute it all to the drugs in your report?

           A.  It sounds to me like Mr. Bordynuik would know more about that than I do because I don't have the report with me and it must go back many years. How Mr. Bordynuik got access to that report concerns me but is typical of what he's done to me.  That report would have been none of his business.  It was a clinical report but obviously he's made it privy to people that it shouldn't be privy to.

34.        Q.  Well, let's stick with answering the questions instead of making speeches.  The fact is that

I asked you if you had a relationship with Ms. Widdis
that involved you treating her, assessing her, and you
didn't recall that and now you are recalling it.

      A.   Yes, you jogged my memory.   Do I have
to answer these, Mr. Hawa?

      MR. HAWA:   Well, within limits.

      BY MR. ABRADJIAN:

35.      Q.   This was marked as Exhibit 1 on
Ms. Widdis' examination.   Does that look familiar to
you?

      A.   Is there a date?

36.      Q.   You can take a look at it.

      A.   Mr. Hawa, this comes from the
computer that was stolen from my house.

      MR. HAWA:   It might help if you answered
a few questions about it.

      THE DEPONENT:   Okay.   There isn't a date.
2004.   Yes.   I wrote that and it's from my stolen
computer. Key entry.

      BY MR. ABRADJIAN:

37.      Q.   Did you continue to provide any
counselling or assessment to Ms. Widdis after that?

      A.   Ms. Widdis and I are friends.
Therapists will talk to each other.   Any therapist will
talk to each other about things.   I believe at that time

she was seeing a psychiatrist for medication.  I believe
she was referred to Dr. Laws in Hamilton and he may have
managed her medication. This is 2004.  She was in the
process of moving.

        MR. HAWA:  Do you have a question about
the report? Are we done with the report? She did a
report.  What else?

        BY MR. ABRADJIAN:

38.        Q.  I asked the question.  It's just
she's -- it would be helpful if you just directly answer
the question.  So the question was, did you continue to
counsel Ms. Widdis and provide her with therapy or
assessments? And then the witness went on with an
answer, counsel, so if you want to have the witness
answer more directly I'm happy to proceed to the next
question.

39.        Q.  I don't know.  But I can tell you
that this was stolen from my home and that really upsets
me.

40.        Q.  That's not the question.

        MR. HAWA:  She answered the question.

        THE DEPONENT:  Thank you.

        BY MR. ABRADJIAN:

41.        Q.  You don't know?

        A.  I don't know.

**NIMIGAN MIHAILOVICH REPORTING**

42.          Q.  That's the answer.  So you don't know
if you continued to provide treatment assessment --

             A.  I don't know.  But I would like to
have something done on this, Mr. Hawa.

             MR. HAWA:  We'll deal with that.

             BY MR. ABRADJIAN:

43.          Q.  Do you have any business or financial
dealings as between you and Ms. Widdis?

             A.  Yes, I do right now.

44.          Q.  Do you owe her money?

             A.  Yes, I do.

45.          Q.  How much money do you owe her?

             MR. HAWA:  It doesn't matter.

             THE DEPONENT:  Ms. Widdis was one of the
first people to step up and help me when I had no income
in 2008.

             BY MR. ABRADJIAN:

46.          Q.  She signed a statement that you
included in your first motion record, Ms. Elsley, along
with some other people.  If we could go to that.  It's
at Exhibit K of Volume 2 of your motion record.  You
included it as an exhibit to your Affidavit.  Exhibit K
and it's page 228 of the motion record.

             A.  Okay.

47.          Q.  Could you tell me the circumstances

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          12

surrounding you obtaining this statement from

Ms. Widdis?

        A.  It was the same as with every other

shareholder I contacted that I simply required

confirmation from them if they purchased shares and it

was for 50 cents and if the share swap to JBII Nevada,

which at that time was 310 Holdings, was for 50 cents as

well.

48.          Q.  So how did you make contact with

Ms. Widdis?

        A.  Telephone call.

49.          Q.  Pardon?

        A.  Initially a telephone call.

50.          Q.  And then was there some other

communication between her and you with respect to this

statement?

        A.  Ms. Widdis doesn't drive on the

highway, so I would have gone up to her house and I

believe this one  -- what is this?

        MR. HAWA:  It's a witness.

        BY MR. ABRADJIAN:

51.          Q.  You're looking at the signature page?

        A.  Yes.

52.          Q.  And you're wondering who the witness

is?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          13

        A.   Yes.  So I believe that she -- let me go back.  I believe I faxed it to her and I'm not sure whose signature that is, but it could be her son-in-law's and then she would have sent it back to me.

53.        Q.   So you were not there when she signed this?

        A.   No. I don't believe so.

54.        Q.   So if she thought you were there that would be incorrect?

        A.   She's done two of these.  And the second one I was there when we went to Toronto, but I believe the first one -- because the signatures, one, I'm not certain of as a witness, I believe I may have picked it up from her but  I don't believe I was there when she did it.

55.        Q.   Who prepared this?

        A.   Mr. Hawa.

56.        Q.   Who provided the information for it to be prepared?

        A.   I guess it came from me, from Mr. Hawa, from the SEC filings, from the information related to JBI Ontario expedite to all that was in the filings.

57.        Q.   So this really isn't something that Ms. Widdis had first-hand knowledge of.  This is

something that you or Mr. Hawa gathered through various

sources, you put it together and then you asked her to

sign it.  Is that how it worked?

        A.  Ms. Widdis had knowledge of how much

she paid for her shares.  She had knowledge of how many

shares she had.  She had knowledge of the share

transactions and she had knowledge that during the share

swap from JBI Ontario that she received equivalent

shares in JBI or 310 Nevada.  She had knowledge of that

and that's what we're asking for.

58.      Q.  How do you know she had knowledge of

that?

        A.  Because that's how she received her

shares.

59.      Q.  Did she tell you she had knowledge of

that?

        A.  Can you be more specific? What are

you asking me?

60.      Q.  I'm asking you what she told you that

she knew.

        A.  About?

61.      Q.  About her shares and how she got her

shares.

        A.  She understood that she --

62.      Q.  No.  I'm asking you what she told

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013            Sandra L. Elsley            15

you.

   A.  What she told me is that she

understood that she got equivalent shares.  She got an

equivalent trade from -- that she believed she paid 50

cents a share for her JBI Ontario shares that were

traded into JBI, into 310 Holdings that she believed

that that's what happened.

63.   Q.  Would it surprise you to know that

she doesn't really remember any involvement in JBI

Delaware?

   A.  That wouldn't surprise me at all.

64.   Q.  Why not?

   A.  Ms. Widdis is 65 years old, lives on

her own, doesn't drive anymore, and for the last three

years has had a very quiet life.  She was one of the

many investors that came into the company who didn't

understand the workings of penny stocks and different

companies and so that would have all gone over her head.

However, she did know  that she got at least equivalent

50 cents for 50 cents a share.

65.   Q.  But this statement goes beyond that.

So a lot of what's in here she wouldn't have said to you

exactly what's in here.  This is something that you

presented to her and asked her to sign.  Correct?

   A.  She didn't write it up herself if

**NIMIGAN MIHAILOVICH REPORTING**

that's what you're asking.

66.          Q.   And she didn't even give you this
information.  This is information that you or Mr. Hawa
gathered, you put it together and you gave it to her to
sign.  Isn't that correct?

             A.   That's correct.  However, I did
explain it to her at length to ensure she understood it
because it is very complex.  The movements that were
made were incredibly complex for anybody to understand.
And frankly if you brought 252 in the room I would
guarantee you that most didn't understand what happened.
They just trusted John Bordynuik.

67.          Q.   Let's keep the speeches to a minimum
and let's --

             A.   I'm sorry, I just have to tell you
what I think.

68.          Q.   -- just try to answer the questions.
And let's try not to talk over each other.  Okay?
Ms. Widdis  said there may have been email exchanges
between the two of you leading up to this statement.

             A.   There may have been.

69.          Q.   Do you remember what the content of
those email exchanges was?

             A.   Only what I was asking for is for her
to have a look at this document.  We don't email too

much together.

70.          Q.  So did it start by you having the
document, emailing it to her and saying, here's the
document, take a look at it?  Or did it start by her
giving you the information and you putting it together
in a document?

             A.  It started by me sending her the
document, giving her the document, explaining what it
meant and asking her if it was accurate to the best of
her knowledge.

71.          Q.  Could you please check your computer
and if there are emails could --

             A.  I'd be happy to.

72.          Q.  -- you please provide us with copies
of all of those emails?

U/T          A.  Absolutely.

73.          Q.  Also with respect to the second thing
you said she signed that you were with her for the -- I
take it  that's the Affidavit that she swore in January?

             A.  That's correct.

74.          Q.  Were there emails exchanged about
that as well?

             A.  Does Mr. Bordynuik know there were?

75.          Q.  That's not what I'm asking you.

             A.  I don't know.  We don't email very

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          18



much but I would be happy to provide them to you if I
have any.

76.          Q.  That would be great.

          A.  Perhaps Mr. Bordynuik could do the
same.

77.          Q.  Did you tell Ms. Widdis the purpose
for which you were asking for this statement?

          A.  Yes, I did.

78.          Q.  What did you tell her?

          A.  I told her that I required knowledge
of what shareholders received and paid for the shares
from JBI Ontario to 310 Holdings Nevada during the share
swap.  Did they pay 50 cents a share or was there
something else that was paid.  That's all I required.

79.          Q.  Did you tell her about the settlement
agreement that you had signed?

          A.  A settlement agreement?

80.          Q.  Yes.

          A.  That I signed?

81.          Q.  Yes.



          A.  No.  I didn't sign a settlement
agreement except for the 300,000 shares.

82.          Q.  Yes.  If you could turn -- do you
know what I'm talking about?

          A.  I signed for 300,000 shares.  She

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          1

was -- show me where to go.

           MR. HAWA:  JBI Affidavit last document

           MR. ABRADJIAN:  The motion record of the

defendant, tab M, Exhibit M.  Tab M in Mark, the last

tab.  Okay.  For some reason mine is the last one.

           MR. HAWA:  You won't have that, Sandra.

I would have that.

           MR. ABRADJIAN:  I think you're in the

wrong motion record.

           MR. HAWA:  I have it here.  It's the last

document.

           THE DEPONENT:  Oh, yeah.

           BY MR. ABRADJIAN:

83.           Q.  So this is where you had a choice

between taking restricted stock or not restricted stock.

Do you remember that?

           A.  I didn't know what I was signing.  I

was coerced.

84.           Q.  Let's just take it one step at a

time, can we?  Just a minute.

           A.  I don't believe that's my signature.

85.           Q.  Let's start there.

           A.  Okay.

86.           Q.  So if we go to the last page there is

a signature there beside what's printed there which is

January 31, 2013                Sandra L. Elsley                20

your name, Sandra Elsley, and then there is a signature
there.

             A.   Mm-hmm.

87.           Q.   All right.  Did you sign this or did
you not sign it?

             A.   How do I answer that? I don't know.

88.           Q.   You don't know whether you signed or
you didn't sign?

             A.   I don't know.  May I comment?

89.           Q.   Did you tell Ms. Widdis about this
agreement?

             A.   When?

90.           Q.   Well, for starters, when you were
seeking the witness statement from her.

             A.   I don't know.  What I would have told
Ms. Widdis is that --

91.           Q.   I don't want to know what you would
have told her.  I want to know what you did tell her.

             A.   I don't recall.

92.           Q.   Did you ever tell Ms. Widdis about
this agreement?

             A.   About this particular one?

93.           Q.   Yes.

             A.   No.

94.           Q.   Did you tell Ms. Widdis that you owed

**NIMIGAN MIHAILOVICH REPORTING**

the company money?

A. I told Ms. Widdis that Mr. Bordynuik said I owed the company money.

95.      Q. And when did you tell her that?

A. Throughout the last four years.

96.      Q. Did you tell her about the loan agreements that you had?

A. Yes, I did. I told her that I didn't know what they were for except for the $50,000, which Mr. Bordynuik has always told me he would pay. Always.

97.      Q. So you were aware that and you don't dispute that you signed those loan agreements?

A. I don't know what loan agreements except for the $50,000 that I signed and he said if I didn't pay in three months he would take a million shares back. Anything else was signed in the open concept area of the office with all of the other employees around and Mr. Bordynuik was in a rage and said if I did not sign it was all over. And I had to sign, and I said I don't even time to read this. I don't agree with this one for $50,000 or a million shares. It's not fair. If shareholders see it they'll see that something  is wrong and he said, you do it now, I have a business meeting. So I don't know what I signed. I know the $50,000 and the one millions shares,



I haven't seen it, but I'm sure I signed something to
that effect.  Anything else I don't know about and I
consistently said, what are these loans for.

98.          Q.  Okay.  So let's take it one step at a
time.  You agree that you did sign a loan document for
the $50,000 that you took as a loan from the company?

             A.  Under coercion and extreme duress.

99.          Q.  But you did sign it.

             A.  Yes.  In October, he fired me on the
17th, so October the Tuesday just before he fired me.

100.         Q.  So that document I think is found at
again the same motion record we were looking at?

             MR. HAWA:  Back up one exhibit.

             BY MR. ABRADJIAN:

101.         Q.  At tab K.  It's entitled loan
agreement. So let's just go to the last page of that.
You can confirm then that that's your signature?

             A.  No, I can't.

102.         Q.  But you don't deny that you did sign
this agreement?

             A.  I was aware of and signed some
agreement for $50,000, and in the event that I didn't
pay it in three  months I would be relieved of one
million.  But I do not believe that's my signature.

103.         Q.  So are you suggesting that you signed

**NIMIGAN MIHAILOVICH REPORTING**

some-- I'll take you to the second page of this
agreement. It seems to suggest that you would give up a
million shares if you didn't repay the loan.  Do you see
that at clause number 6?

      A.   Okay.  Mm-hmm.  I see that.

104.      Q.   Then there is an initial there.

      A.   I see that.

105.      Q.   Are those your initials?

      A.   I don't believe so.

106.      Q.   So just so I understand your
evidence, are you saying that you acknowledge that you
signed the loan agreement for the $50,000 loan, which
also contained a provision that you would return a
million shares to the company if you didn't pay the
loan, but don't know whether this is the agreement that
you signed?

      A.   Correct.  I don't believe that's my
signature.

107.      Q.   So in fact it's more than you don't
know.  You are saying this is not the agreement you
signed?

      A.   I'm saying that's not my signature.

108.      Q.   So where is the agreement that you
signed and how is it different than this agreement?

      A.   In December Mr. Bordynuik told me

that he would take care of all of these things as
promised.

109.          Q.  Ms. Elsley, we're going to be here
all day --

              A.  That's okay for me.

110.          Q.  -- if you don't directly answer the
question.  Do you know where the agreement is that you
signed?

              A.  No.

111.          Q.  Do you know if it was different than
this agreement that we're looking at --

              A.  I don't know.

112.          Q.  -- that appears to have your
signature on it?

              A.  With respect anything that he had me
sign I couldn't even read it.  There was no time.  He
was so angry..  He was just about spitting on me.

113.          Q.  So let's talk about the agreement
that you signed.  You admit that you signed an
agreement?

              A.  Yes.

114.          Q.  And that was to repay the $50,000
that you borrowed from the company?

              A.  Correct.

115.          Q.  If you didn't repay it you would

return a million shares?

          A.   Yes.  I was in disagreement of it and I never saw the $50,000 ever.

116.        Q.  When did you sign that agreement?

          A.   I believe that agreement was signed three days before he fired me, the Tuesday, at ten minutes to twelve as he was running out the door to his meeting.

117.        Q.  So what was that date then?

          A.   Do you have a calendar?

118.        Q.  When did he fire you?

          A.   The Friday.

119.        Q.  Do you remember the date?

          A.   About October 17, so 17, 16, 15, 14. The 14th, 15th.

120.        Q.  Okay.

          A.   Friday 16, 15th. 14th.

121.        Q.  And you say you signed it about ten minutes before --

          A.   12.

122.        Q.  -- noon?

          A.   Yes.

123.        Q.  And was this at the office?

          A.   It was at the office.  Steve Doede was there, Brian Seaburn, Katie Matkowski, some of our

other stuff.

124.        Q.  Was Mr. Doede employed by JBI at the
time?

            A.  He was the CEO.

125.        Q.  And that's D-o-e-d-e?

            A.  D-o-e-d-e.

126.        Q.  And Brian?

            A.  Seeburn, S-e-e-b--u-r-n.

127.        Q.  And who is he?

            A.  He was the computer person for John.
I don't know exactly what he did.

128.        Q.  So these people were all present when
you signed?

            A.  Yes, they were.

129.        Q.  Do you know who witnessed your
signature?

            A.  Brian did.  So that is Brian did
witness it.  He wasn't even given an opportunity to read
it.  So he didn't know what he was signing.

130.        Q.  When you said Brian, you pointed at
the document we've been looking at.

            A.  Yes.  That's his name.

131.        Q.  Is that his signature above his name?

            A.  I wouldn't know.

132.        Q.  But you do remember that he witnessed

**NIMIGAN MIHAILOVICH REPORTING**

your signature?

        A.   Yes, I do.

133.        Q.   So tell me to the best of your recollection what the discussion was at that time when you signed that agreement?

        A.   John called me into the area that he worked in, because at that time I was working in investor relations, I was behind closed doors because the office was too noisy, he called me in and said, you have to sign these now.  And I said, what do I have to sign now? He said, you have to sign all these agreements or we can't move this company forward. It's imperative that we do this now.  And I said, John, I don't know what I'm signing.  And then I caught sight of the 50,000 -- well, he said, here's the Cooper thing.  And I said, John, you always told me you would take care of that.  You always told me that that was something that you would take care of because you made me fire my lawyer and you said you would act on my behalf and take care of whatever.  He said, I've got to go pay the lawyer now.  I said, I would like to come with you.  I would like to see this.  No, you can't come.  I don't even know if a cheque was exchanged frankly.  I assume they were paid. And I said, but, John, you've got here, if I don't pay in three months that you'll take a

**NIMIGAN MIHAILOVICH REPORTING**

million shares from me. That's not fair and that will
not look good to shareholders.  It seems illegal to me.
And he said, oh, I'm just putting that because.  And I
said, John, you know I have no money to handle it in
three months.  If we don't go  public by November which
you promised, November 2008, what am I going to do.  He
said, it's just for your signature. You don't have to
worry about it.  I was not happy.  I was scared but by
this point I was very scared of him.  He had already
fired me once when I said I would never lie for the
company.

134.          Q.  You said that he wanted to you sign a
bunch of documents.

              A.  Yes.

135.          Q.  What else was there in addition to --

              A.  I have no idea.  He just had them on
a clipboard and he said, sign here, sign here, sign
here.  He would flip the pages, sign here.  But, John, I
don't know what I'm signing.  Don't worry about it.
We've got to get this done to take this company public.
And remember John and I were still engaged.

136.          Q.  It's helpful if you just let me
finish the question before you answer it.

              A.  Sorry.

137.          Q.  So you don't remember what other

January 31, 2013               Sandra L. Elsley               29

documents you signed that day?

        A.  I don't have a clue.

138.      Q.  You remember catching sight of the
50,000 and the million shares and talking about that.
Do you remember catching sight of anything in the other
documents?

        A.  I don't.

139.      Q.  And the reason he gave you for the
million shares was I think you said just because or it's
just for your signature so there was really no reason
given?  Correct?

        A.  Yeah.

140.      Q.  And you signed it anyway?

        A.  I had no choice.

141.      Q.  Why did you have no choice?

        A.  Because John insisted because we were
a couple.  I was still engaged to him and he had an
anger in him that frightened me.  I was frightened for
my daughter because he had gone after her before in
different ways.  She was living in Toronto and I just
didn't want any grief.  I had seen his very vindictive
nature, experienced it, and by then it was, deal with it
later.  I can't deal with him.

142.      Q.  The other people that you mentioned,
they were all around when you were being asked to sign

**NIMIGAN MIHAILOVICH REPORTING**

these papers?

        A.   Yes.

143.        Q.   So what you've told me was said, they

would have been present for those things?

        A.   They would have been present.

144.        Q.   And tell me why you say now that this

document that is at tab K alleged by Mr. Bordynuik to be

the  loan agreement that you signed, why do you now say

that that is not the loan agreement you signed or that

is not your signature?

        A.   I explained to Mr. Hawa and I want to

explain it to you about how you can tell my signature.

And I've shown him how you can tell my signature and

what I see tells me it's not my signature.

145.        Q.   So your rationale is by just looking

at your signature you can tell that that's not your

signature?

        A.   That's what I believe because there

is a certain way I write my signature that I don't see

in that document.

146.        Q.   But the fact is you're not disputing

that you did sign something that said you owed $50,000

and that  --

        A.   That's correct.  I'm not disputing

that.

**NIMIGAN MIHAILOVICH REPORTING**

147.          Q.  -- if you didn't pay it you would
have to return a million shares?

A.  That's correct.  But we resolved that
in December.

148.          Q.  Because you said something else about
Cooper.  So what was the -- is that what the 50,000 was
for?

A.  Yes.

149.          Q.  That was to resolve the lawsuit?

A.  Yes.

150.          Q.  You were being sued?

A.  Correct.

151.          Q.  And that lawsuit was resolved?

A.  Yes.

152.          Q.  And $50,000 was paid to resolve it?

A.  Yes.

153.          Q.  And it was paid by the company?

A.  I don't know if the company paid it.
I assume the company paid it.  I never saw a cheque.

154.          Q.  You didn't pay it?

A.  I didn't pay it.

155.          Q.  And the lawsuit did go away?

A.  Yes, it did go away.  I failed to
consummate a house deal and the house with filled with
asbestos they hadn't disclosed.  It was a century old

**NIMIGAN MIHAILOVICH REPORTING**



home. Half a million dollar home.

156.        Q.   You've now submitted today this
morning another Affidavit which deals with the PIPE.  Do
you know what I mean by PIPE?

          A.   Yes, I do.

157.        Q.   Do you agree that you did not
participate in that PIPE?

          A.   Yes.  No, I agree.  Nor did my
daughter.

158.        Q.   And do you understand that
Ms. Widdis's  -- do you understand that Ms. Widdis
loaned the company money?

          A.   Yes, I do.

159.        Q.   The company was indebted to her?

          A.   Yes.

160.        Q.   And you understand that that debt was
converted into shares?

          A.   Yes.

161.        Q.   And you understand that that's how
Ms. Widdis participated in the PIPE by having her debt
converted into shares?

          A.   I don't believe that's true.   I
believe that all 252 shareholders that were part of the
IPO were told that they were part of an IPO.  Never told
they were part of a PIPE.  Ever.

---

**NIMIGAN MIHAILOVICH REPORTING**

162.          Q.  I understand that's what you believe.

              A.  Mm-hmm.

163.          Q.  Is it possible that what happened was that Ms. Widdis's debt was converted into shares and that's how she participated in the PIPE?

              A.  Would she not have received documentation to that effect?

164.          Q.  Ma'am, I'm just asking if that's possible.  Do you know?

              A.  I'm not a lawyer.  I'm not an US securities person.  I don't know how that works.

165.          Q.  Thank you.  Your daughter held shares as a beneficiary of a trust, held shares in the company, correct?

              A.  Yes.

166.          Q.  And were you the trustee?

              A.  Yes, I was.

167.          Q.  And Mr. Bordynuik I think in his Affidavit says that your daughter or the trust did participate in the PIPE?

              A.  That's ridiculous.  Number one, we were told that to be part of the PIPE you had to be accredited. My daughter was a student, definitely not accredited nor was I, and I purchased shares for her, $3,000 during the IPO, money taken from her insurance

**NIMIGAN MIHAILOVICH REPORTING**

policy in order to do so. Unless Mr. Bordynuik did

something without explaining it to us and giving us the

paperwork, she was as much a part of the IPO as all of

252 shareholders.

168.          Q.   You acknowledge that you did borrow

money from the company?

              A.   No.

169.          Q.   You don't acknowledge that?

              A.   Are you talking about the $50,000?

That was given to me.  It wasn't -- oh, okay.  How do I

explain that?

              MR. HAWA:  Well, explain the history with

the  company.

              THE DEPONENT:  The history with the

company is Mr. Bordynuik told me right from the

beginning of our relationship that our company was

50/50.  It was for us. Secondly, when we needed money

for our company he told me he would take over my lawsuit

from Guy Ungaro in Niagara Falls and insisted that I not

deal with him, that he would handle my legals and take

care of it because he knew that and he his sons were

living at my home, paying nothing for almost three years

for me to take care of things and not to worry, Sandra,

I will take care of it.  That was always the

understanding until August when Mr. Bordynuik changed

completely toward me.

170.        Q.   August of what year are we talking about?

            A.   August of 2008.

171.        Q.   The 50,000, was that advanced after August of 2008?

            A.   Yes.

172.        Q.   So you knew at least with the 50,000 that it was a loan and that's why you signed it?

            A.   He said it was a loan.

173.        Q.   And that's why you signed the loan agreement?

            A.   I signed the loan agreement because he was so angry.  He was almost spitting on me and there was  nothing else I could do.  And I also felt that if we were public in November 2008 I didn't care who paid it.  I just wanted it taken care of.  But he always assured me he would take care of it.  And in December, Mr. Hawa has a memo to that effect, that he would take care of it.

174.        Q.   Where is that memo?

U/T         MR. HAWA:  I'll undertake to provide the memo.

            MR. ABRADJIAN:  No.  That is certainly not good enough.  You're examining my client tomorrow,

**NIMIGAN MIHAILOVICH REPORTING**

Mr. Hawa.

THE DEPONENT:  I probably have something in here.  Or you have it.  I gave it to you the other day.

MR. HAWA:  Is it in the Affidavit materials?

THE DEPONENT:  No.  It's what I gave you just recently.

MR. ABRADJIAN:  I would need to see that today, please.

THE DEPONENT:  I can find it.  Did you bring the stuff that I gave you the other day?

MR. HAWA:  I didn't bring all the files. So the best I can do is have a look.

THE DEPONENT:  I can find it for you very quickly.

MR. HAWA:  You can find today?

THE DEPONENT:  I can come to your office if  you want to find it quickly.  Basically what he says is, I'm taking care of these things because it doesn't look good on the books.

BY MR. ABRADJIAN:

175.       Q.  So he didn't say to you when you signed that $50,000 that it was to satisfy shareholders?

A.  The million dollars was.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          37

176.          Q.   That it was to satisfy shareholders?

A.   Yes.   I said, why are you doing this, John? Why are you telling me I have to give you a million shares back when this is only $50,000.   Why are you doing that? I don't understand it.   And he said, oh, it's just basically to satisfy the shareholders because you're really not supposed to take this money out of the company.

177.          Q.   That's not what you told me earlier. You said earlier he said it was just because and just sign it. Now you're saying it was to satisfy shareholders.

A.   Well, there were two conversations. Why are you making me do this, just sign it, and then afterwards we had other conversations about it.   John, why did you have me do that? You know that wasn't fair. And so did that conversation happen in October?   It may have happened in December, the second conversation.

178.          Q.   So in the second Affidavit that you submitted you said you didn't recall signing any loan agreements.   And then in the third Affidavit that you submitted you did recall signing at least the 50,000.

A.   The 50,000.   There were agreements that Mr. Bordynuik wanted me to sign during mediation and I gave to those to Mr. Hawa recently.   I remember

---

**NIMIGAN MIHAILOVICH REPORTING**

signing those and he wanted to give me $30,000.  Happily

never litigate and go away.  And I think all of that

stuff confused the other issues.

179.          Q.  So just explain for me and the

benefit of the Court why in your second Affidavit you

say you didn't recall signing the loan agreements.  And

then in your third Affidavit all of a sudden you do

recall signing the loan agreement, at least the 50,000.

          A.  I have 10,000 sheets of documentation

at my house at least.  I kept everything.  And I went

through again everything with a fine-tooth comb looking

for everything that happened because Mr. Hawa and any

legal team doesn't want too much stuff all at once.  And

when I found documentation I brought it to Mr. Hawa.  I

showed it to him and told him what the circumstances

were and what happened. The only thing I remember

signing, because it was so contentious, was the $50,000

one million shares document.

180.          Q.  You understood that when this motion

was commenced to freeze Mr. Bordynuik's assets that you

had to be very frank and disclose everything to the

Court?

          A.  Absolutely.

181.          Q.  Is there any reason why you didn't

talk about the loan agreement and the fact that you had

signed a $50,000 loan agreement that also included a
clause that you would return a million shares to the
company?

        A.   There was no reason not to except
that I didn't recall it.

182.        Q.   Why didn't you also --

        A.   No, no, no.  Let me add to that.
Mr. Bordynuik, and we're going to present it to you,
said he would take care of everything in a December
email to me when we were negotiating, when we were
involved in the mediation.  And when he thought he was
going to get my signature on all sorts of stuff, and the
reason he didn't get my signature on all sorts of stuff
was because he didn't provide the proper paperwork to
see what I was signing off on etcetera.

183.        Q.   When you say December, what are you
talking about?

        A.   December 2008.  We mad had mediators
involved with us for about six weeks.

184.        Q.   Who were the mediators?

        A.   Mike Salveta, Alison Rowan I think.

185.        Q.   Could you spell those last names?

        A.   S-a-l-v-e-t-a and Alison -- I think
you  have it in your documents.  They're from the area.
Mike Salveta told me not to sign.

**NIMIGAN MIHAILOVICH REPORTING**

186.          Q.  Was he a lawyer?

              A.  He was a mediator.  He said it wasn't
fair.  I talked to my broker.  At the time he said it's
not fair and you shouldn't sign.  You're wise to walk
away from that.

187.          Q.  Your broker was Larry Maxwell?

              A.  That's correct.

188.          Q.  And when you're talking about not
signing, was that the settlement agreement that we
looked at earlier? That's what they told you not to
sign?

              A.  There were loan agreements.  That
settlement agreement that you showed me at the end that
I don't believe I signed, that was something very
different. When I talked to Larry Maxwell about those
things he said he knew nothing about US securities.

189.          Q.  So what was it that you were told not
to sign? ? Did you produce those?

              A.  I was told not to sign the loan
agreements, which I don't ever recall getting a loan
from Mr. Bordynuik except for the $50,000 and whatever
else he was wanting me to sign, which I think was to
sign never to litigate against him or the company ever.
He was going to give me $30,000, I would never litigate
against the company  or John and I to go away.

**NIMIGAN MIHAILOVICH REPORTING**

190.          Q.  So hopefully we'll see this December 2008 document and these other documents.  It's great that Mr. Hawa has them.  I don't think we do.

A.  I just found them.  I just found them on the weekend.

191.          Q.  Well, you were aware though when you brought the motion to freeze the assets that Mr. Bordynuik in his defence to your lawsuit had referred to the loan agreements and the settlement agreement.  Correct?

A.  In his defence?

192.          Q.  Yes.

A.  Yes.

193.          Q.  And so did that not cause you to look for loan agreements or to try to refresh your memory as you have done since and to bring that forward to the Court?

A.  I have material throughout my house in closets all over the place.

194.          Q.  That could be, but you did understand that the loan agreements and the settlement agreement were documents that Mr. Bordynuik was relying upon as part of his defence and yet you didn't tell the Court about those in your first Affidavit.  Correct?

A.  Because I believed that those

**NIMIGAN MIHAILOVICH REPORTING**

agreements were ridiculous because I never borrowed money from the  company.

195.          Q.  But you knew that that's not what Mr. Bordynuik's position was?

A.  I'm not a lawyer.

196.          Q.  Well, his defence was relying on those agreements.  Right?  You knew that?

A.  I don't recall.  I thought that his defence should be more reliant on the SEC Rule 144 which is how he took my shares from me.  Not loan agreements.

197.          Q.  Well, thank you for your --

A.  I was a shareholder as much as anyone else and he was supposed to be protecting me too.

198.          Q.  Thank you for your opinion on what you thought his defence should contain but can we move on now. The settlement agreement, you were provided with information about that settlement agreement prior to June 25, 2009, correct?

A.  The settlement agreement, no, I wasn't. I did get emails because I asked to see what he wanted me to sign off on.  And it's typical with Mr. Bordynuik, and I've seen him do this many times before, he sent me an attachment that couldn't be opened and there is a correspondence that Mr. Hawa has to that effect.  Prior to that I had been asking from investor

relations, please send me all this information.  It

didn't come until the day before, it  couldn't be

opened.  I said, please, would you send a staff over to

my residence to show me what you have.

199.          Q.  Ms. Elsley, you've now seen the

supplementary responding record that there was submitted

in Mr. Bordynuik's Affidavit which attaches emails that

he exchanged with you prior to June 25, 2009 where you

and he are discussing the settlement agreement.  You

acknowledge that those email communications took place,

correct?

          A.  I don't know.

          MR. HAWA:  What are we looking at?  What

exhibit? I think you said K and you said F but it is

actually K so let's have a look as far as those emails.

Unless they're in the wrong order, but I think you said

F and F wasn't relevant but I looked at K and it seemed

a little closer to it.

          MR. ABRADJIAN:  I'm referring to exhibits

E and I believe F as well.

          MR. HAWA:  Okay.  We'll Start off with

what he says. Is E relevant or not?

          MR. ABRADJIAN:  E and F.

          MR. HAWA:  How does E start, for your E

just to make sure we're in the right order with these

January 31, 2013             Sandra L. Elsley                44

emails.

      MR. ABRADJIAN:  E is an email from Sandra
Elsley to John Bordynuik and the subject is, piece.
That's June 24, 2009.

      THE DEPONENT:  That's when Mr. Bordynuik
was asking me to get onto the message boards and post.

      MR. HAWA:  What does it have to do with
the agreement, the attached agreement?

      MR. ABRADJIAN:  The next page, same tab,
June 16, 2009.

      MR. HAWA:  "John, thank you for helping
me."

      MR. ABRADJIAN:  Or, "John, if you are
unable to fax me perhaps you could have the
documentation requested dropped off." And then further
emails June 15.  And then if we go to tab F, other
emails.

      MR. HAWA:  Nothing is referring to the
settlement agreement nor is it an attachment.  So now
this is F.

      MR. ABRADJIAN:  Mr. Hawa, I'm not really
asking you the question, okay? I'm asking your client
whether she acknowledges having email exchanges with
Mr. Bordynuik prior to June 25, 2009 regarding the
settlement.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013                Sandra L. Elsley

THE DEPONENT:  So what's your questio

BY MR. ABRADJIAN:

200.        Q.  I just asked it again.

            A.  I'm sorry, I wasn't listening.  I was
reading.

201.        Q.  Do you acknowledge that you had email
communication with Mr. Bordynuik about the settlement
agreement prior to June 25 2009?

            A.  No.  I don't believe I saw any of
this.

202.        Q.  So these emails that are at tab F,
you don't believe that this is --

            A.  I don't recall it.

203.        Q.  -- authentic?  Oh, you just don't
recall it?

            A.  Yeah.  And there is a good chance
it's not authentic.

204.        Q.  Do you have any evidence of that?

            A.  Of what?

205.        Q.  What would you rely on to say it's
not authentic?

            A.  The email that when I found out that
John was taking my shares from me, it was about a day
before we had to go in to sign off.  That's my
recollection.  And Larry Maxwell was involved in that

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley



and had a conversation with John because I didn't
understand what John was telling me.  Larry Maxwe
broker, was very upset, very nervous, and didn't
what was going on.

206.          Q.  Okay.  Can we just focus on the
question.  So I asked you whether you acknowledged
having email exchanges with Mr. Bordynuik prior to June
25, 2009 about the settlement agreement.  And I think
your answer is, no, you don't acknowledge that.

          A.  I don't recall.

207.          Q.  You don't recall.  Okay.  You did
though consult with Larry Maxwell about settlement
agreement.

          A.  I consulted with Larry Maxwell about
the SEC Ruling 144 which said that John, Steve Doede,
Mr. Bordynuik Senior and myself could not carry our
stock into the 310 holding shell.

208.          Q.  And that was something that was being
discussed around the time of the settlement agreement,
right?

          A.  Yes.

209.          Q.  You discussed that with Mr. Maxwell?

          A.  And he didn't know anything about it.
He said he knew nothing about US securities.

210.          Q.  And did you talk to him about these

**NIMIGAN MIHAILOVICH REPORTING**

options about restricted and unrestricted shares and
which one you should take?

        A.   He said he knew nothing about US
securities.

211.        Q.   I appreciate that you're telling me
that.   The question is did you discuss the settlement
agreement with him?

        A.   What I recall doing is asking John to
have Larry Maxwell bring everything over to my home so I
could look at it, so that I could go over it with him,
and  John said absolutely not.   You have to come to the
office and you have to pick it up and you have to sign
there.

212.        Q.   So again to answer my question, is it
that you did consult with Mr. Maxwell about the
settlement agreement and the choices you had or no?

        A.   No.

213.        Q.   You did not?

        A.   No.

214.        Q.   So if Mr. Maxwell was to say that you
did, that would be incorrect?

        A.   Probably, yes.  Mr. Maxwell, the only
thing that I knew that he said, and we had this
conversation afterwards, is he knew nothing about US
securities which I found strange.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          48

215.          Q.  In your first Affidavit you did not

reference the settlement agreement.  You didn't disclose

it to the Court and you didn't attach it.  Is that

correct?

         A.  That's correct.  If I had it I would

have.  If any of the lawyers that I sought out because I

sent everything to them that was pertinent.  If they had

seen it they would have highlighted it.  Paliare Roland,

Chris Little from Bacchus Law, Derrick Fulton from

Strype Law.  This was something that was never in the

documentation.  It was something that I never had in my

hands to show anyone.

216.          Q.  You knew about it though?

         A.  No, I didn't know about it.  I never

got to see it.

217.          Q.  You knew about it before the motion.

         A.  John told me on conference call with

all of his staff present that, and he was laughing, that

because of the SEC Ruling 144 I could only get 300,000

shares.  I knew he told me that.

218.          Q.  In his Statement of Defence he talked

about the settlement agreement so you knew that that's

what he was saying that there was a settlement agreement

and you had a choice and you made a choice.  Why didn't

you bring that up to the Court?

**NIMIGAN MIHAILOVICH REPORTING**

A.  I'm not a lawyer.  I didn't understand what was going on.  I was extremely upset by all of it and I didn't understand.  And at that point I had absolutely no trust in John Bordynuik.

219.          Q.  So on the settlement agreement, are you saying you signed it or you didn't sign it?

A.  What I recall singing is for 300,000 shares.  Leaving that I would continue to get 300,000 shares per quarter as he had told me consistently.

220.          Q.  So you did sign something?

A.  Yeah, I signed for 300,000 shares.

221.          Q.  What is it that you signed?

A.  Mr. Hawa has it.

222.          Q.  Can we see it?

A.  It's a purchase agreement for 300,000 shares.

MR. HAWA:  That's the purchase agreement with these proxy companies as part of her Affidavit materials.

BY MR. ABRADJIAN:

223.          Q.  Is the share purchase agreement?

A.  Yes.

224.          Q.  Is that the only thing you say you signed?

A.  To the best to my recollection I

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley            50

signed the same as Pat Widdis did.

225.          Q.  Is it possible that you also signed
the settlement agreement?

              A.  Anything is possible.  Is it possible
I didn't?

226.          Q.  So on that day on June 25, 2009 when
you signed whatever it is that you signed, there was no
pressure or coercion on that day?

              A.  Yes, there was.

227.          Q.  There was? Even though you thought
you were signing something where you were just being
treated the same as everything everybody else?

              A.  I was very embarrassed to come into
this  office, number one.  I had been a 13.1 percent
owner.

228.          Q.  Let's get just this --

              A.  Let me just say this.  I had built up
this business with my money and helped Mr. Bordynuik
across three years and helped build the staff and he had
belittled me consistently.  He had said that me, a
family therapist, had assaulted him in a parking lot,
called police on me.  I was afraid to even go in the
door because of that.  In fact when I tried to get
things out of the office I sent a police court.  Did I
feel good walking into that office with shareholders who

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley              51

knew the story and were also embarrassed for me,
horrified that that had gone on and there were
shareholders there.  Lynn Bordynuik was there.  Katie
Matkowski, people I knew.  One of my teachers from
public school who I had sold shares to.  It was very
embarrassing, very disconcerting, and any person who has
any sensitivity would not have wanted to be in that
position.

229.          Q.  So when you went in under those
circumstances you didn't have any kind of long
conversation or any conversation with Mr. Bordynuik that
day?

          A.  Yes.  I asked to go back and talk
with him.  So he told me where I had to sign and I said
I needed to have a lawyer see it, and then I said I
would like to go see what you're doing back here hoping
that he and I could have a private conversation so that
I could find out what  was really going on.

230.          Q.  And did that happen?

          A.  No.  He refused.

231.          Q.  He refused to go back with you?

          A.  Oh we went back.  No.  He refused to
have a conversation with me.  And in fact Mr. Barnett
saved him from me.

232.          Q.  Who is that?

**NIMIGAN MIHAILOVICH REPORTING**

A.  Mr. Barnett, the handyman turned chemist.

233.        Q.  So on that day, June 25, 09, you didn't have a conversation about the shares or anything relevant to this case in front of everybody that day?

A.  No.

234.        Q.  You had a conversation just with Mr. Bordynuik in the back?

A.  We walked to the back.  I met his Russian computer guy, we walked back to the mobile tape reading unit and Pat Widdis stayed back because she knew I wanted to have a conversation with Mr. Bordynuik to find out what was he was doing, to have him explain this to me in a private situation that wouldn't embarrass anybody and he refused.

235.        Q.  So you signed?

A.  We did talk but he refused to talk to me about any of that.  I signed for 300,000 shares.

236.        Q.  And that document that you signed is the share agreement that you've produced and you think you might have signed something else, you don't know, you don't recall?

A.  I took away anything that I signed and I didn't have anything like that that I took away.

237.        Q.  And Ms. Widdis wouldn't have been

January 31, 2013          Sandra L. Elsley          53

present to witness any of the conversation between you and Mr. Bordynuik?

A.  She walked back there with us but when he and I walked into the mobile tape reading unit it was just the two of us.  She was watching.

238.          Q.  So she didn't witness the conversation you and Mr. Bordynuik had?

A.  In the tape reading unit?

239.          Q.  Yes.

A.  At the back of the warehouse?

240.          Q.  Yes.

241.          Q.  She was lip reading.  She could have. She could have seen what was happening.

242.          Q.  At that time in on June 25, 2009, did you think you were getting basically treated the same as everybody else?

A.  I didn't know.

243.          Q.  You didn't know?

A.  I didn't know.  I assumed that because John Bordynuik was the CEO a publicly trading company he couldn't do anything illegal, that he had a fiduciary responsibility to me and that he would take care of it. That he couldn't do something that was incorrect with the SEC or FINRA.

244.          Q.  So when you left you were not upset

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013                Sandra L. Elsley               54

or unhappy, you didn't think he had done something
illegal or untoward?

           A.   I didn't know.

245.        Q.   So you were not upset or unhappy at
that time?

           A.   I was sick to my stomach because I
didn't know.

246.        Q.   And had you consulted anybody?

           A.   Yes.

247.        Q.   Who had you consulted?

           A.   I contacted Derrick Fulton from
Strype Law and he said the situation with US Securities
was far too complex and he could not give me an opinion.

248.        Q.   When was that that you contacted him?

           A.   That was right around the time that
John was asking me to come in and sign the shares but I
didn't have the agreement.  I just said he's quoting a
SEC Ruling 144 saying I can't have all my shares moved
like everybody  else's, what do I do.  And he said it
was far too complex.

249.        Q.   So that was in June of 2009?

           A.   That's correct.

250.        Q.   So when you left the office and you
were driving I take it you were driving back Ms. Widdis?

           A.   Yes.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          55

251.          Q.   Do you remember who was driving?

              A.   No.

252.          Q.   Did you drive back to your house or
her house? Where did you go?

              A.   I don't recall.   I would assume we
would go back to her house.  I know Pat was really
excited because she had been become a millionaire and
John made that very clear.  She was confused by how much
she got and he said, take the money and run right now
before I change my mind. But for her sake I brought in
people I really cared about. They had done well.  I was
happy for them.

253.          Q.   Can we stick with the questions,
please?

              A.   Okay.

254.          Q.   So did you talk to Ms. Widdis on the
way to the office about what was going to happen? What
you were going to sign and what you were going to get?

              A.   I would imagine I said I was very
uncomfortable going to the office.  I didn't want to go
and I didn't know what I was facing and I didn't know if
Mr. Bordynuik would charge me again with assault.
That's probably what I was saying.

255.          Q.   Please don't guess.  Just tell me if
you remember exactly what you said.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          56

          A.  I don't remember exactly.

256.      Q.  Do you remember approximately what
you said?

          A.  No.  Except I was throwing up.

257.      Q.  Why were you throwing up?

          A.  Because I didn't really care to see
him again.  He had done a lot of damage to me and my
daughter.

258.      Q.  Did you know how many shares you were
going to get before you showed up at the office that
day?

          A.  I knew that initially I would get
300,000 shares.

259.      Q.  So you knew that before you showed up
at the office?

          A.  Everybody was.  Or what he had told
me, I'm sorry, is that my understanding had been
consistently throughout the year that those of us who
had larger shareholdings would get 300,000 shares per
quarter.  At one point, and Mr. Hawa has this too, John
wrote me and said, oh, good news, we can get 500,000
shares, and that's really good to start off.

260.      Q.  So you have a written document where
Mr. Bordynuik says you will get $300,000 a share per
quarter?

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013             Sandra L. Elsley              57

---

           A.  No, no, no.  300,000 shares.

261.        Q.  Per quarter.

           A.  Maybe.

262.        Q.  Do you have something in writing?

           A.  Maybe.  Maybe.

263.        Q.  Where is that?

           A.  Back at the ranch.

264.        Q.  It's not in these materials?

           A.  Is it?

           MR. HAWA:  I don't think there is any
emails from John Bordynuik in that regard.

           BY MR. ABRADJIAN:

265.        Q.  Is there anything in writing?

           A.  I would have to go looking.  But it
was certainly our understanding.  Not just mine.  John
Bordynuik Senior, Steve Doede and John's.

266.        Q.  Ms. Widdis, she got more than 300,000
shares.

           A.  I know.  That was the confusion,
wasn't it? That's when I started to think that he had
really duped me.

267.        Q.  So on the ride back you knew that
Ms. Widdis has gotten 500,000 shares or more?  Correct?

           A.  Mm-hmm.

268.        Q.  Correct?

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013                Sandra L. Elsley              58

A.   Correct.

269.        Q.   And you had received 300,000 shares?

A.   Mm-hmm.

270.        Q.   You have to say yes or no.

A.   Yes. Sorry.

271.        Q.   So you thought there was a problem right there?

A.   Yes.

272.        Q.   Did you talk to Ms. Widdis about that?

A.   It wasn't her problem.

273.        Q.   Did you talk to her about it?

A.   I probably did.

274.        Q.   Do you remember what you said?

A.   No.

275.        Q.   Except I knew I needed to see a lawyer. I knew I needed to find an US Securities lawyer and have them sort it out because I'm not -- I didn't understand the it the SEC Ruling.  I didn't understand any of it and I still couldn't believe that John Bordynuik, the CEO of a publicly trading company would take advantage of me that way.

276.        Q.   Do you know who Frank Coy is --

A.   I do so.  I very much know who Frank Coy is.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013              Sandra L. Elsley              59

277.          Q.  Please just let me finish the

question.

              A.  Sorry.

278.          Q.  Who is he?

              A.  Frank Coy was the manager of RBC

Dominion Securities who became very involved in JBI

Ontario and at one point, and he was an investor in our

company, he handled the portfolios for many investors at

JBI Ontario and he was Larry Maxwell's best friend.

279.          Q.  Was he involved in and around June

25, 2009 with respect to the shares?

              A.  I never saw him but I do know that

Joe Hunter, another friend of mine, said he was there

later in the day as was Larry Maxwell.

280.          Q.  Have you told me everything that you

recall being discussed at the JBI offices about the

shares and whatever is relevant in this proceeding?

              A.  I told Katie and John I needed to see

a lawyer.  I didn't trust him.

281.          Q.  Okay.  Have you told me everything

now?

              A.  It's four years ago.  As much as I

can remember.

282.          Q.  So was Katie present with you and

John when you went into the back room?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley              60

---

          A.  No, no.

283.      Q.  So when did you tell Katie that you
needed to see a lawyer?

          A.  When she got the file out and told me
where to sign.

284.      Q.  Where did you sign it?

          A.  I signed it in the reception area
where -- it was a lobby area, there was a desk there,
and there were many other shareholders, many who I knew,
who I had brought in.

285.      Q.  So did you sign it before you went
into the back with --

          A.  Yes, I did.

286.      Q.  Please let me finish the question.

          A.  Okay.

287.      Q.  Before you went into the back?

          A.  Yes.

288.      Q.  So you signed it and then you went
into the back and had your discussion with
Mr. Bordynuik?

          A.  I tried to have a discussion with
Mr. Bordynuik.

289.      Q.  And what was Katie's response to you
saying you needed to see a lawyer?

          A.  Katie appeared to be very nervous.

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          6·

290.          Q.  Did she respond to you?

              A.  No.

291.          Q.  Did Mr. Bordynuik respond to you?

              A.  When he's doing something wrong he
gets a sneaky little smile on his face.  That was his
non-verbal response.

292.          Q.  Ms. Widdis was there with you?

              A.  Mm-hmm.

293.          Q.  In the reception area?

              A.  Mm-hmm.

294.          Q.  Correct?  You have to say yes or no.

              A.  Yes.

295.          Q.  Did she overhear you asking about
seeing a lawyer?

              A.  Yes.

296.          Q.  You knew that you didn't have to sign
the settlement agreement that day?

              A.  No.  Absolutely not.  He said I had
to come in and sign or all will be lost.

297.          Q.  The emails that we looked at that you
don't recall getting or sending seem to suggest that you
didn't have to sign that day?

              A.  That's correct.  And I don't recall
receiving those emails or I wouldn't have shown up.
Mr. Bordynuik told me, and Mr. Bordynuik is a master at

**NIMIGAN MIHAILOVICH REPORTING**

sending out emails that never arrive.  He told me I had

two days to get in there or all would be lost.

298.          Q.  Do you have anything in writing with

respect to that statement?

             A.  I think Mr. Hawa may have some of

that back at the office.

             MR. ABRADJIAN:  Mr. Hawa, it seems like

you may have a lot of information that we don't.

U/T          MR. HAWA:  I'll undertake to check the

files.

             MR. ABRADJIAN:  And provide all those

documents?

             THE DEPONENT:  If I may --

             MR. ABRADJIAN:  Mr. Hawa, is that an

undertaking?

             MR. HAWA:  Could you describe the

documents again?

             MR. ABRADJIAN:  Well, at this point the

witness has referred to a lot of documents that she

appears to have provided to you that we haven't seen, so

any relevant document we would ask that you produce.

             MR. HAWA:  Relevant to?

             MR. ABRADJIAN:  To the motion.

             THE DEPONENT:  To having to be in there

on time in two days or else.  Can I elaborate on this?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          63

MR. ABRADJIAN:  No.  I just want to get this straight with Mr. Hawa because I'm not just looking for the documents about being in there in two days. There are other documents that the witness has referenced.  I'm looking for  any document that you have that is relevant to the motion.

MR. HAWA:  I believe I've provided you with all those.

MR. ABRADJIAN:  Not according to this witness.

MR. HAWA:  Anything else in the Affidavit of Documents I've provided to you but otherwise I'll have to search my record.

MR. ABRADJIAN:  I don't want to get it after Mr. Bordynuik's examination and I don't want to get it like I did this morning, another Affidavit you know the morning of.  I would appreciate it if you could provide those tonight.

THE DEPONENT:  I believe you have those in that stack.  May I say something to this?

BY MR. ABRADJIAN:

299.      Q.  Does it relate to the question?

          A.  It does.

300.      Q.  Okay.

          A.  I believe that several people would

**NIMIGAN MIHAILOVICH REPORTING**

be willing to give Affidavits to swear to --

301.          Q.  Okay.

              A.  -- having had to be in in two days.
Mr. Hunter had just gotten out of the hospital and was
told he had to come in.

302.          Q.  Ma'am --

              A.  And Ms. Widdis's son who is a doctor
in the head department, in the Department of
Anesthesiology, he had to rush from work to get in after
a 14-hour shift.

303.          Q.  You say that Mr. Bordynuik assured
you that your shares of JBI Ontario would become shares
of Delaware and were being transferred to Nevada, they
were going to be protected and that you would be a
shareholder of the Nevada in the same proportion, 13.1
percent I think you say.  Correct?

              A.  Correct.

304.          Q.  Give me your complete knowledge,
information and belief in support of that statement?

              A.  There were numerous emails that
transpired between John from August of 2008 when he
said, you are a major shareholder in this company.
Shares just don't disappear.  To emails and even in the
SEC filings that still listed my shareholdings as 7.8
million give or take. There was correspondence and

January 31, 2013          Sandra L. Elsley          65

conversations.  What John did end of May and June
started to call me again.

305.          Q.  What year are we talking about now?

          A.  2009 before we went public.  He would
call me late in the evening and tell me how hard it had
been and that he had gotten involved with some very bad
people and it had been very hard bringing the company
public but all was well.  He asked me to start to post
on the message  boards and he reassured me that my
shareholdings would be there for me.

306.          Q.  So if I've got this right, number
one, you say there are numerous emails?

          A.  Mm-hmm.

307.          Q.  Number 2, you're relying on the SEC
filing?

          A.  Mm-hmm.

308.          Q.  And number three, phone calls that he
made to you?

          A.  That's correct.

309.          Q.  So let's deal with each one of those
in turn?

          A.  Okay.

310.          Q.  The emails where he assures you that
you will have the same proportionate shareholding.

          A.  Mm-hmm.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          66

311.          Q.  Have you produced all of those?

MR. HAWA:  You mean in the Affidavits?

MR. ABRADJIAN:  Yes.

MR. HAWA:  Let's have a look.  Can we go off the record for a moment?

MR. ABRADJIAN:  Sure.

--- Off-the-record discussion.

BY MR. ABRADJIAN:

312.          Q.  So while we were off the record we found I think the one tab that you're relying on with respect to the assurance provided to you.  And that's tab N there is an email and I think what Mr. Hawa has termed as a newsletter, which also seems to be in the form of an email.  Maybe it's not.  I don't know.  But is there anything other than what's at tab N that you're relying on in support of your assertion that there were emails where Mr. Bordynuik assures you that you get proportionate shares of Nevada?

A.  In other emails everybody was assured was part IPO that we would in fact would get more shares probably when it was worked out.

313.          Q.  That's the same email, isn't it?

A.  No.  I think there is another one.

314.          Q.  Where is that?

A.  I would have to find that too.

**NIMIGAN MIHAILOVICH REPORTING**

Mr. Hawa didn't want me to bring everything.  He said
the Court's get upset if you have too much material.  So
I tried to pick out the ones that stood out the most to
me that were relevant and said what other things said.

315.          Q.  At least in this material that we
have that's the only tab where there is an email where
you said you're being assured that you're going to get
the same proportionate shares?  Correct?

          A.  That's correct.  But I was also
verbally  assured by Mr. Bordynuik.

316.          Q.  We're going to get to that.

          A.  Okay.

317.          Q.  So in terms of emails you think there
might be this other one where the other shareholders
were assured?

          A.  Mm-hmm.

          MR. ABRADJIAN:  So could we have a copy
that, please?

U/T          MR. HAWA:  Undertaking to make best
efforts for an email regarding assurance by John
Bordynuik about number of shares to be provided.

          BY MR. ABRADJIAN:

318.          Q.  And You said you were verbally
assured. Is that the telephone calls that you're talking
about?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013               Sandra L. Elsley               68

---

A.   Yeah.

319.          Q.   Okay.  So can you tell me whether these calls -- I think you said they were in May and June of 2009.

A.   That's correct.

320.          Q.   And these were calls initiated by Mr. Bordynuik to you?

A.   Yes.

321.          Q.   And he was assuring you in these calls that you were going to get the same percentage of shares in  Nevada that you had in Delaware?

A.   Yes.

322.          Q.   Okay.  So how many calls were there?

A.   I don't recall.  He probably has kept records of it all and I would say he was calling me consistently until we had to go in and sign our shares.

323.          Q.   But specifically --

A.   Maybe across two weeks.

324.          Q.   Specifically about assuring you that you were going to get the same proportionate number of shares, how many calls would he have made that assurance in?

A.   It would have been one.  I wouldn't have asked again.

325.          Q.   So you asked him a question and he

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          69

gave you an assurance in one phone call.  Do you remember when that was?

A.  He stopped communication with me as soon as I signed off, so it would have been, I don't know, across a month he would call.  We signed off I think June 26th for the 300,000 shares so it would have been across the month of June.  I don't know how often he talked to me.  We had talked to each other before that too about some concerns I had about Brenda Bagley, the bookkeeper, and what she said.

326.          Q.  Let's just focus on the question for now.

A.  Sometime across June.

327.          Q.  So you think this one phone call was sometime in June?

A.  Mm-hmm.

328.          Q.  Yes?

A.  Yes.  Sorry.

329.          Q.  Do you remember what you asked and what he said to the best of your recollection?

A.  He said, I told you I would always take care of you and I would be good to my word.

330.          Q.  And that was in answer to your question being what?

A.  I probably didn't even ask a

question. He probably just said it.

331.          Q.  That's the best you can --

              A.  That's the best I can give you.  When
Mr. Bordynuik started to call me I didn't trust it.  I
wondered what he wanted because the damage he had done
to me was so great in October of 2008, so I listened to
hear what he had to say to me.  He told me he had made
some big mistakes and he told me how hard it all was and
that he had gotten involved with some bad people.

              MR. ABRADJIAN:  Let's take a break for a
minute.

              --- Off-the-record.

              --- Short Recess.

              THE DEPONENT:  May 28th is around the
time that he started calling me.  I just got an email.

              BY MR. ABRADJIAN:

332.          Q.  So can we go to your first Affidavit
in your motion record and that was sworn December 18,
2012.

              A.  Okay.

333.          Q.  Have you got it?

              A.  Which number?

334.          Q.  Tab 2 of the motion record.
Paragraph 60.  You start that paragraph by saying you
had some suspicions about the number of shares you

received in JBI Nevada?

      A.   Correct.

335.     Q.   303,000 shares and because of those suspicions you consulted with lawyers?

      A.   Yes.

336.     Q.   And then you were told certain things?

      A.   Correct.

337.     Q.   First of all the things that you were told, do you have that writing?

      A.   Mr. Hawa?

      MR. HAWA:  I'm just having a look at this. Does she have what in writing?

      MR. ABRADJIAN:  What she says she was told  here because I think she says, "Because Bordynuik had initially acquired."

      THE DEPONENT:  I can speak to that.

      MR. HAWA:  Please do.

      THE DEPONENT:  Yes.  I went to Groia in Toronto, spent two hours with them.  I went to Paliare Roland and spent time with them.  What they told me was that the file would cost me so much money because of the SEC filings having to know about US Securities but they did give me an opinion.  I think that's what it's called.  Can I say the opinion?

**NIMIGAN MIHAILOVICH REPORTING**

MR. HAWA:  You can.

THE DEPONENT:  That there had been theft.
It would appear there had been theft from the company.

BY MR. ABRADJIAN:

338.          Q.  Do you have something in writing?

A.  Do.

339.          Q.  Can you provide that to us?

A.  Should I?

U/A          MR. HAWA:  That's correspondence between
her and her lawyers and I would have to take that under
advisement.  I'm going to say solicitor/client privilege
for that.

THE DEPONENT:  I think so, yeah.  What
they advised me to do is get a US Securities' lawyer and
pursue  various avenues.

BY MR. ABRADJIAN:

340.          Q.  Here's the thing.  I think maybe it
is privileged but you can't sort of have it both ways.
So if you're going to tell me what it says and try to
rely on that in some way for the Court then I think
you've waived it and I need to see the document.  If
you're not going to rely on it or say anything then
you're probably right, it is privileged and I shouldn't
have it.

But here in your Affidavit you've said

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          73

some things and I just wanted to know specifically about
these things that you say that the 40,250,000 shares was
to be distributed to the shareholders in the same
proportion as their shareholders of Delaware.  I mean I
think that's what your lawsuit is.

          A.  Yes.

341.          Q.  So on that specific point if you've
got something in writing that you're going to rely on
then I would like to see that.  If you're just throwing
that in there, I don't know for what purpose, but you
know it's probably something that shouldn't be in there
then I'm happy to move on.  I think you have to sort of
pick one or the other, don't you, counsel?

          THE DEPONENT:  Can we take it out of the
letter? I have it from two lawyers, two legal firms.

          MR. HAWA:  My client's position doesn't
rely on that paragraph.  She provides an opinion and a
conclusion from what she was told by her lawyers.  Now
we know that those shares came from other than John
Bordynuik shares.

          MR. ABRADJIAN:  That's what I'm going to
get at.  So it may not really be all that important but
I just wanted to clear that up.  So if you're not
relying on those then let's move on.

          MR. HAWA:  Okay.

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          74

MR. ABRADJIAN:  Okay.  So we'll move on.

THE DEPONENT:  May I make one statement?

BY MR. ABRADJIAN:

342.          Q.  Well, let me just ask you a question.
You're aware now, whatever you may have been told or
thought back then, that the other shareholders that the
shares they received didn't come from John Bordynuik's
shares, the 40 million.  You're aware of that now,
correct?

MR. HAWA:  She's not completely aware of
that.  And if I may clarify.

MR. ABRADJIAN:  Yes.

MR. HAWA:  We're not sure.  We have an
information gap because we don't know where these proxy
companies got their shares because John was returning
shares back to the proxy companies, back to JBI.  So
whether or not in turn the proxy companies got those
shares we don't know.  Hopefully we'll know that on
discoveries.

MR. ABRADJIAN:  Well, you're aware though
that there were pre-existing shareholders of 310 as
well.

MR. HAWA:  As well, yes.

MR. ABRADJIAN:  And that the shares that
Mr. Bordynuik purchased, the 40 million, were not all of

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013            Sandra L. Elsley            75

the outstanding shares.

MR. HAWA:  No.

MR. ABRADJIAN:  And I think you're also
are aware that the shareholders purchased shares not
from this 40 million but from the pre-existing
shareholders.

MR. HAWA:  From some of these companies
including Ms. Elsley when she bought her 300,000 shares
they were not directly from Bordynuik shares.

MR. ABRADJIAN:  So can we agree then that
this information that you have here that the
shareholders were supposed to get shares distributed to
them from the 40 million is not necessarily correct.
Can we agree on that?

MR. HAWA:  It's a logical conclusion
based on the knowledge we had at the time.

MR. ABRADJIAN:  At the time.  Can we
agree now that that's not necessarily correct.

MR. HAWA:  Whether some of those shares,
the Bordynuik shares were indirectly provided to the
shareholders we don't know if they went to JBI and then
to  the proxy companies to be provided to the
shareholders who signed these agreements.

MR. ABRADJIAN:  You mean if they were
returned to Treasury and then from Treasury went to

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013              Sandra L. Elsley                    76

---

third parties?

        MR. HAWA:  Yes.

        MR. ABRADJIAN:  Okay.  But can we agree
that they were not provided -- that shareholders were
not directly provided with shares from Mr. Bordynuik?
Can we at least agree on that?

        MR. HAWA:  Directly we can agree on that.

        MR. ABRADJIAN:  Okay.

        BY MR. ABRADJIAN:

343.        Q.  So then the next paragraph you have
there, Ms. Elsley, paragraph 61, which says, "I was to
have received 13.1 percent of those shares."

        I take it at this time when you're doing
this you're still talking about the 40,250,000 shares
that they were supposed to be provided to you.  We can
agree now that it's not the shares, Mr. Bordynuik was
not to provide them to you.

344.        Q.  In your position you were supposed to
be treated like the other shareholders.

        A.  Correct.

345.        Q.  So if the other shareholders didn't
get them directly from Mr. Bordynuik you agree now that
you  don't get them directly from Mr. Bordynuik.
Correct? Can we agree on that?

        MR. HAWA:  No, I don't think so.

---

**NIMIGAN MIHAILOVICH REPORTING**

MR. ABRADJIAN:  Okay.

MR. HAWA:  It doesn't really matter where the source is.  If the other shareholders had sufficient shares the proxy companies had sufficient to provide them at a tenth of a penny to the JBI Delaware shareholders, that's fine.  But otherwise Bordynuik was responsible whether through the proxy companies or through his own shareholdings to provide those shares to the shareholders.

The understanding was that those shareholders in Delaware would get a proportionate number of shares. Somehow Bordynuik was able to identify these shareholders, convince them that they should sell their shares at a tenth of a penny and a tenth of a penny to the shareholders of Delaware who had no idea who these shareholders of Nevada were and he got them their shares for a negligible amount.

MR. ABRADJIAN:  And if Ms. Elsley was treated the same as those shareholders, her position is that's what should have happened with her as well. Assuming that there were enough shares and there were people willing to sell them.

MR. HAWA:  It really didn't matter what the source was whether it was Bordynuik or the other shareholders.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley

MR. ABRADJIAN:  But the other shareholders of Delaware that got Nevada shares th didn't get them through Bordynuik.  So her positic she should have been treated the same way.

MR. HAWA:  We don't know that if they did or did not.  Directly or indirectly perhaps from his transfer back to JBI.

MR. ABRADJIAN:  And I understand that now you've requested to amend your claim to include JBI Nevada in the claim?

MR. HAWA:  Yes.

MR. ABRADJIAN:  And I take it that's one of the reasons why you've done that?

MR. HAWA:  Not necessarily.  Well, the reason why is that shares were to have been provided by John Bordynuik to Sandra Elsley in any way from any source and there aren't enough shares and he transferred them back to the JBI so JBI owned shares that belonged to Sandra.

MR. ABRADJIAN:  But also isn't your argument that it's not necessarily John Bordynuik who should have provided the shares.  It's however the other shareholders were treated, which I think we now know it wasn't John Bordynuik who gave them John Bordynuik's shares, but it was JBI who arranged for shares to be

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          79

provided then really your  claim is as against JBI, is
it not?

MR. HAWA:  Not necessarily.  It's against
both.  John Bordynuik was undertaking all of these, as
you knew from Pat Widdis, nobody really understood what
he was doing.  He was doing it on behalf of the
shareholders.  They didn't know who these proxy
companies were.  He put them together in order to
fulfill his obligations to the shareholders.

MR. ABRADJIAN:  What's the status of your
request to amend the claim?

MR. HAWA:  Status use mean?

MR. ABRADJIAN:  Where are you at with it?

MR. HAWA:  Requesting your consent.  I
sent it yesterday to --

MR. ABRADJIAN:  To Mr. Dearden?

MR. HAWA:  To Mr. Dearden, yes.

BY MR. ABRADJIAN:

346.        Q.  If we could go to paragraph 18 of
your second Affidavit.  This is the Affidavit that's
marked January 2, 2013.  Yes.  It was sworn on January
2, 2013. It's this one.

A.  Oh, I'm sorry.  January 2, 2013.

347.        Q.  Paragraph 18, page 4.

A.  Okay.

**NIMIGAN MIHAILOVICH REPORTING**



348.          Q.  Here you give some information about believing that Mr. Bordynuik is living in a motel with his sons?

A.  Correct.

349.          Q.  And you say you were advised by mutual friends?

A.  Correct.

350.          Q.  Who were the mutual friends?

A.  I prefer not to say.  But it's very easy to see his vehicle because it's on a section of the highway between St. Catharines and Niagara Falls and his vehicle it's a black Acura.  It's very visible.

351.          Q.  So you're refusing to tell us who the mutual friends are?

A.  What would be the purpose of telling you?

352.          Q.  So you're refusing?

THE DEPONENT:  Mr. Hawa?

MR. HAWA:  Well, I would answer that question.  You can answer that question.

THE DEPONENT:  It could cause problems for the friends because he's already caused problems with this person.

MR. HAWA:  All right.  I don't think it's that relevant a question anyway.

**NIMIGAN MIHAILOVICH REPORTING**



THE DEPONENT:  I know who I can tell you told me because I checked it out with the real estate agents.

BY MR. ABRADJIAN:

353.        Q.  But that's not the friends you're talking about here?

R/F        MR. HAWA:  It really not that relevant a question.  It's a motel or whether he was living in it, the whole thing or part of it?

BY MR. ABRADJIAN:

354.        Q.  I'll take it as a refusal.  Did the friends tell you the circumstances of how he was living in this motel?

            A.  Linda Landry told me that it was a power of sale.

355.        Q.  That's the realtor?

            A.  Yes.  And that it was being renovated and it had sold for about $160,000 and was in one of the worst areas of Niagara with lots of crime and drugs and nefarious activities.

356.        Q.  When did you talk to Linda Landry?

            A.  I spoke to Linda Landry about this -- when did I tell you?

            MR. HAWA:  I don't recall exactly when you told me.

January 31, 2013          Sandra L. Elsley          82

THE DEPONENT:  And I'm supposed to remember? Before Christmas.  When did I write this? I think it would  have been in the late fall I found out.

BY MR. ABRADJIAN:

357.          Q.  So did Linda Landry act on the sale of the property?

A.  No.

358.          Q.  How did she know about it?

A.  She's a real estate agent.  She's an acquaintance of mine and happened to come across it.  We found it interesting that he bought such a scummy motel.

359.          Q.  You knew that he had purchased it or someone had purchased it?

A.  I did when she checked it out for me.

360.          Q.  And that he wasn't sort of a patron there.

A.  I haven't talked to John Bordynuik in a long time so I didn't know what he was doing with it. I don't know that his name is listed on the deed.  I think it's a numbered company.

361.          Q.  It's just that the impression you give here is that he's so destitute that he's living in a motel.

A.  That wasn't my intent.

362.          Q.  Okay.  Well, that's what it seems

Disp.

like here.  Would you agree with me?

     A.  No.  That was not my intent.

363.    Q.  That's what it appears to be though here,  correct?

     A.  Yeah.  No.  Knowing John, no.  John is a fly by the seat pants kind of guy and living in a motel or living in a mansion I could see him doing both for some reason.  There would be a strategy behind it.

364.    Q.  But the impression here is that he's basically disposed of so many assets and that he's destitute and basically living in a motel.

     A.  That wasn't my thinking.

365.    Q.  So why didn't you also say here that you thought that he was renovating it and that he may have had some hand in purchasing it?

     A.  Because I didn't know.  I didn't speak to him.  It would have been third-hand information.  That would have been inappropriate.  Had I gone and knocked on his door and said, what are you doing here, John, and he gave me the information I would have been free do that.

366.    Q.  This is already third-hand information and you're putting it in your Affidavit.

     A.  That he's living in a motel? I've seen his vehicle there.

---

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley            84

367.          Q.  But you said you were advised by
mutual friends.  You didn't talk to him about it.  They
told you he's living in a motel.

          A.  Okay.  I'll tell you but hope it
doesn't  cause a problem.  Blair Burgess, the father of
the two boys that are there sometime who has been very
afraid that he would leave with the boys and go into the
States or some other place and in fact has been in touch
with the border patrol.

          MR. HAWA:  That's the reason it's there.

          BY MR. ABRADJIAN:

368.          Q.  We're beyond that now.  I'm asking
why you were not forthcoming this paragraph and instead
of leaving the impression that he's so destitute that he
can't afford his own residence, that he's living in a
motel, why wouldn't you put in the information which --

          A.  What Mr. Burgess told me --

369.          Q.  Just let me finish.  The information
you knew at that time which included the information you
had from the realtor which was that he had a hand in
purchasing it and was renovating it.  Why didn't you put
that information in here because that's not a
dissipation of assets?

          A.  Let me be clear what I was told by
Mr. Burgess.  That Mr. Bordynuik had moved from his

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          8'

other house to a scummy hotel located on Lundy's Lane
down from strip clubs.  The house was filled with moul
and the units were filled with mould and he didn't know
why he had moved there.

370.          Q.  Did you know that it was wasn't being
renovated?

A.  No.  I wasn't terribly interested.

371.          Q.  But you the realtor told you that.
You mentioned that earlier.

A.  No, I don't think I said the realtor
said it was being renovated.  I saw it being renovated
because I drove by.

372.          Q.  Okay. So you knew it was being
renovated.  Why didn't you put that in here? You knew
that he wasn't like a patron of the motel.  He had an
interest in it and was renovating it.  Why didn't you
put that in here?

A.  I really didn't know that.  It was
all hearsay I assumed.  But I wasn't trying to hide
anything.  I wasn't trying to mislead anyone.  What I
thought if anything is what a perfect place to take off
from.

373.          Q.  You also are aware that JBI has
offices in Ontario?

A.  Does he?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          86

374.          Q.  You're not aware of that?

          A.  There has been some confusion.  I
don't get newsletters from JBI Ontario or JBI Nevada.
The only things that I read are on message boards and
there is some confusion.  In fact most recently I read
that the corporate office no longer existed in Thorold
but I don't know that for a fact.  I do know that when
Mr. Hawa has tried to  forward information to
Mr. Robert, I believe the information came back to you
and the only place you could send it to was New York.

          MR. HAWA:  It seems that way.

          BY MR. ABRADJIAN:

375.          Q.  Have you driven by the Canadian
address for JBI?

          A.  Not for maybe two years.

376.          Q.  So you brought this motion saying
that everything was being moved outside of Canada and
Ontario, you drove by the motel but you didn't bother to
drive by the corporate address for JBI in Canada to see
whether or not assets were still in Ontario?

          A.  It wouldn't have made any difference
because there is nothing that I know of on the door or
anywhere that would show that JBI is a presence in that
building.  And I wouldn't go to the building or go
inside of it for fear that I would be thrown out.  So I

January 31, 2013                  Sandra L. Elsley

would have no reason to know that the corporate offic[e]
is anywhere in Ontario.  But I do know that they have
warehouse and I assume that's where they do a lot of
corporate work on Iroquois Street in Niagara Falls, New
York, and I would assume that Mr. Bordynuik does most of
his work from his present residence.

377.          Q.  Did you take any steps to investigate
whether there were assets in Ontario?

              A.  Explain that better.

378.          Q.  Did you take any steps to investigate
to determine whether or not there were assets in Ontario
with JBI Nevada?

              A.  I wouldn't know how to do that.

379.          Q.  Did you ask?

              A.  Ask who?

380.          Q.  Ask Mr. Bordynuik's lawyers for one.

              A.  I wouldn't know that I could do that.
If they were to ask Mr. Hawa if I had assets, would he
tell them?

              MR. HAWA:  No.

              THE DEPONENT:  Thank you.  Not that I do.

              BY MR. ABRADJIAN:

381.          Q.  I think it's a different situation,
but maybe if we were going to bring a motion to freeze
your assets we might want to ask Mr. Hawa first before

**NIMIGAN MIHAILOVICH REPORTING**

we allege that you're taking all of your assets out of
Ontario before spending all the money and everybody's
time and energy?

        You understand that Mr. Bordynuik's
shareholdings were available on line before you
commenced your proceeding?

        A.  Do I?

382.        Q.  Do you agree now that he had
approximately 4.3 million shares as at May of 2012 and
that that's public record?

        A.  I can tell you that there was
confusion about how much he had.  And last I recall from
June when we filed this to December, he had depleted
more of his assets. Part of the problem is that
Mr. Bordynuik doesn't always file things properly and
amends things which has been consistent across the board
since 2008.

383.        Q.  Did you tell the Court that there was
confusion about how many much shares he had?

        A.  Mr. Hawa?

384.        Q.  Well, it's not Mr. Hawa's Affidavit,
ma'am.  It's your Affidavit.  You're the one providing
the information --

        A.  I wouldn't know --

385.        Q.  Just hear me out.

January 31, 2013             Sandra L. Elsley             89

---

MR. HAWA:  What's the question?

BY MR. ABRADJIAN:

386.       Q.  The question is, did you tell the Court?

A.  Tell them what?

387.       Q.  That there was confusion about how many shares Mr. Bordynuik had in your Affidavit?

A.  I wouldn't have thought to say that, but what I would have told the Court is that I've seen him do this to other people, deplete assets, move assets, do the same think he's done to me.  And he's very strategic so there was every chance that he would do everything possible to move things or shut things down.

388.       Q.  That's not the question.  So if you want the question, please just answer the question. That wasn't the question.  You're answering a different question.

A.  Okay.

389.       Q.  So my next question is, did you know in December of 2012 when you brought this motion and put in it the Affidavit that he depleted assets after you started your claim in June of 2012?

A.  I received information that he had.

390.       Q.  And what was that information?

---

**NIMIGAN MIHAILOVICH REPORTING**

A.  And it came from SEC filings.

391.        Q.  And what was that information?

A.  And that he had, and I think this is what you spoke to at the last hearing, that since June he had depleted, he had sold millions of shares.  I don't recall how many.

392.        Q.  So you knew that as of December 2012?

A.  Correct.

393.        Q.  And you didn't tell the Court?

A.  Yes, they were told.  You did tell the court.

394.        Q.  Ms. Widdis gave an Affidavit recently in  this proceeding in addition to her statement.  Were you involved in securing that Affidavit?

A.  Mr. Hawa was involved in securing it.

395.        Q.  Were you involved?

A.  I drove her there.  She doesn't drive on the highway.

396.        Q.  Did you help her understand what she was putting in her Affidavit?

A.  No.  Ann Gray, Mr. Hawa's assistant, explained it all to her.

397.        Q.  So you explained nothing to her?

A.  Probably not, no.

398.        Q.  Did you tell her why it was that you

were seeking an Affidavit from her?

      A.   Can you show me where it is?

399.     Q.   Her Affidavit?

      A.   Yes.   What I looking at now?

400.     Q.   Well, how does that relate to --

      A.   Well, I just want to see what you're
asking me.   I mean I'm woman so women talk to each other
about everything.   I would assume I talked about this.

401.     Q.   It's in your supplementary motion
record.

      A.   Yes.   I'm looking.

402.     Q.   Sworn January 18, 2013.

      A.   Yes.   I talked to her about and I
said to her read it over, Ann will talk with you.   See
if there is anything that isn't accurate that if you
don't agree with. If so, they'll amend it.   It looked
very straight forward to me.   And she seemed at the time
when we looked at it -- in fact where she looked at it
was in Tim Hortons in Kitchener the day that we went to
sign it.   And I gave it to her, she read it over.   I
went and got hot chocolate and donuts and when I came
back I said, do you understand it? Does everything look
okay? And she said, yes.

      And then when we went to see Ann Gray,
Mr. Hawa's assistant, she asked here if there were any

---

**NIMIGAN MIHAILOVICH REPORTING**

questions, made sure she read it over again.  Do you

understand everything.  And there was more she wanted to

say in it but of course it wouldn't have been

appropriate and she signed it.

403.          Q.  She says, I don't know if I asked

this already, but she says that there may have been

emails exchanged between the two of you about this

Affidavit.  Do you recall that?

              A.  I don't recall it.  I doubt it

because don't email exchange too often.

404.          Q.  Okay.  Could you please check?

              A.  I certainly will.

405.          Q.  And if there are emails if you could

provide them?

U/T           A.  I will.

406.          Q.  If you go to paragraph 9 of your

first Affidavit.  That's this one.

              A.  Okay.

              MR. HAWA:  Tab 2.

              THE DEPONENT:  Am I here?

              BY MR. ABRADJIAN:

407.          Q.  Yes.

              A.  Nine?

408.          Q.  Yes.  Here you say that before 2009

Mr. Bordynuik had been impecunious for long periods of

**NIMIGAN MIHAILOVICH REPORTING**

time and for a number of years lived with you and off of
you?

        A.  Correct.

409.      Q.  And then you attach an exhibit, a
copy of a printout, from the Bankruptcy Court.

        A.  Mm-hmm.

410.      Q.  Dated August 10, 2012.

        A.  It's dated August 10?

411.      Q.  That's what it says in your Affidavit
here?

        A.  Or is that when I pick it up?

412.      Q.  I don't know.  I'm just reading your
Affidavit.  Where did you get that?

        A.  In court in Toronto.

413.      Q.  When did you get it?

        A.  Within the last couple of years.

414.      Q.  And were you sure that that was about
Mr. Bordynuik being bankrupt personally?

        A.  He wasn't bankrupt personally.  His
company was bankrupt.

415.      Q.  Did you put that in here in this
Affidavit?

        A.  I think there was some confusion but
Mr. Bordynuik had absolutely no money.

416.      Q.  So you knew that he was not

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013                 Sandra L. Elsley              9⟨

---

personally bankrupt?

        A.  I knew that his company was
personally bankrupt.

417.          Q.  So you knew that he was not
personally bankrupt?

        MR. HAWA:  That's what bankrupt means.
It's a legal term.

        THE DEPONENT:  I know he had no access to
credit.  He had to borrow money from his lawyer to put a
mortgage on his house in Niagara-on-the-Lake.

        BY MR. ABRADJIAN:

418.          Q.  You knew that this court document did
not relate to Mr. Bordynuik personally having declared
bankruptcy.  You knew that.

        A.  I knew that he was bankrupt the day
I -- applications.

419.          Q.  Ma'am, the question is you knew, did
you not, that this document you attached to this
Affidavit did not relate to Mr. Bordynuik having
declared personal bankruptcy?  You knew that, didn't
you?

        A.  It doesn't say that he declared
personal bankruptcy.

420.          Q.  Ma'am, the question is, did you know
that?

---

**NIMIGAN MIHAILOVICH REPORTING**

A. Did I know that he hadn't declared personal bankruptcy, no I didn't know that.

421.        Q. That's not the question.

A. Okay. Say it again.

422.        Q. This document that you attached to your Affidavit, you knew that that document did not relate to Mr. Bordynuik having declared personal bankruptcy. You knew that.

A. I knew that.

423.        Q. Thank you.

A. But he was not maybe legally bankrupt but he was bankrupt.

424.        Q. At the time that you swore this first Affidavit, the only information that you had about dissipation of assets were shares that Mr. Bordynuik returned to Treasury all of which was done prior to you commencing your claim in this proceeding? Correct?

A. Could you say that again? I'm sorry.

425.        Q. All of the information that you had about dissipation of assets related to Mr. Bordynuik returning shares to Treasury all of which was done prior to you commencing this proceeding in June of 2012.

A. No. That's not all the information I had about Mr. Bordynuik dissipating assets.

426.        Q. Well, you would agree with me that in

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          96

your first Affidavit that's the only information you put
in?

A.  I would agree with that.

427.          Q.  Okay.  You knew that you had an
obligation make full and frank disclosure?

A.  About more assets being depleted?

428.          Q.  About everything.  About your
position, his position.

A.  I believe that the other dissipation
of assets, if I remember properly, Mr. Hawa, he said
don't get into it.  But it was related to his last
partnership with Robert Murray Clark, a lawyer from
Windsor, and that resulted in the bankruptcy and those
assets were dissipated actually brought over to JBI.

429.          Q.  Did that take place after you started
this claim in June of 2012 or before?

A.  That took place before.

430.          Q.  Right.

A.  Should I have put that in?

431.          Q.  You didn't put in information in your
Affidavit about dissipation of assets after June of 2012
when you started this claim.  Do you agree with me on
that?

A.  I didn't put anything in about
dissipation of assets?

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          97

432.          Q.  That took place after June of 2012 in
your first Affidavit.  Is that correct?

          A.  Is that correct?

          MR. HAWA:  That is correct.  You put it
in your Affidavit.

          MR. ABRADJIAN:  Can we take five minutes,
please.

          MR. HAWA:  Yes.

          --- Off-the-record.

          --- Short Recess.

          MR. ABRADJIAN:  Subject to the refusals,
under advisements and undertakings, those are my
questions.

          --- Off-the-record.

---Whereupon the proceedings adjourned at 1:40 p.m.

**NIMIGAN MIHAILOVICH REPORTING**

January 31, 2013          Sandra L. Elsley          98

**I HEREBY CERTIFY THE FOREGOING** to be the evidence of **SANDRA L. ELSLEY, a Moving Party/Plaintiff**, given under oath before me **on the 31st day of January 2013**, recorded verbatim and later transcribed by me.

CERTIFIED CORRECT:


_Fiona P. Yule_

Fiona P. Yule, CSR
Chartered Shorthand Reporter
Commissioner of Oaths (expires July 2013)


This document must bear the original signature and certification of **FIONA P. YULE**, the Reporter in Attendance, at the examination of this witness in the above-captioned matter.  Absence of this certification and signature is indication this document has been reproduced without the permission of **NIMIGAN MIHAILOVICH REPORTING,** and as such is not an original document and therefore in direct contravention of Ontario Regulation 587/91, Courts of Justice Act, January 1, 1990.

**NIMIGAN MIHAILOVICH REPORTING**